# Exhibit C

## THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH

| | |
|---|---|
| ZEBEDIAH GEORGE DALTON; BLUERIBBON COALITION; KYLE KIMMERLE; and SUZETTE RANEA MORRIS. <br><br> *Plaintiffs,* <br><br> v. <br><br> JOSEPH R. BIDEN, JR., in his official capacity as President of the United States; DEB HAALAND, in her official capacity as Secretary of Interior; DEPARTMENT OF THE INTERIOR; TRACY STONE-MANNING, in her official capacity as Director of the Bureau of Land Management; BUREAU OF LAND MANAGEMENT; THOMAS VILSACK, in his official capacity as Secretary of Agriculture; DEPARTMENT OF AGRICULTURE; RANDY MOORE, in his official capacity as Chief of the Forest Service; and UNITED STATES FOREST SERVICE, <br><br> *Defendants.* | Civil Action No. 4:22-cv-0059-DN <br><br> Judge David Nuffer <br><br><br> **DECLARATION OF P. DAVID POLLY IN SUPPORT OF MOTION OF GRAND STAIRCASE ESCALANTE PARTNERS, SOCIETY OF VERTEBRATE PALEONTOLOGY, AND CONSERVATION LANDS FOUNDATION TO INTERVENE AS DEFENDANTS** |

## DECLARATION OF P. DAVID POLLY

I, P. David Polly, declare as follows:

1.     My name is P. David Polly. I am a member of the Society of Vertebrate Paleontology (the "Society" or "SVP"). I submit this Declaration on behalf of SVP in support of intervention in the above-captioned matter.

1

2.      I am a citizen of the United States and a resident of Indiana, where I have lived for approximately 16 years.

3.      I am currently employed at Indiana University as a Professor in the Department of Earth and Atmospheric Sciences and have worked in this capacity since 2006. My job duties include research in paleontology and related fields, teaching, and service to the university.

4.      Prior to working at Indiana University, I worked at Queen Mary, University of London from 1997 to 2006; at the Natural History Museum in London from 1996 to 1997; at the University of Michigan-Ann Arbor from 1994 to 1996; at Genentech, Inc. in 1994; and at the University of California-Berkeley from 1988 to 1994.

5.      I received my Bachelor of Arts (Plan II Honors Program) from the University of Texas-Austin in 1987 and my PhD (Paleontology/Integrative Biology) from the University of California-Berkeley in 1993.

6.      I am a member of SVP and currently sit on the Government Affairs Committee. I became a member in 1987. I was a Board Member from 2014 to 2020 and served as Vice President from 2014 to 2016, President from 2016 to 2018, and Past President from 2018 to 2020 (and I served a separate term on the Board from 2005 to 2008).

7.      I am over the age of eighteen and am competent to testify. This Declaration is based on my personal knowledge and belief.

8.      SVP is a non-profit organization exempt from taxation under 26 U.S.C. § 501(c)(3), incorporated under the laws of California, and headquartered

in McLean, Virginia. SVP has approximately 2,400 members as of September 2022. Members include both professional and avocational paleontologists.

9.     As set out in SVP's constitution, SVP's purpose is to advance the science of vertebrate paleontology and facilitate the cooperation of those concerned with the history, evolution, ecology, comparative anatomy, and taxonomy of vertebrate animals, as well as the field occurrence, collection, and study of fossil vertebrates and the stratigraphy of the beds in which they are found. The Society also supports the discovery, conservation, and protection of vertebrate fossils and fossil sites.

10.     SVP has been advocating for decades to conserve public lands as a means of ensuring access to, and the protection of, paleontological resources. Beginning in 1991, SVP successfully argued against bills in the United States Senate that would have permitted the commercial collection of paleontological resources on public lands, and SVP continued to work with Congressional agencies to increase protections for vertebrate fossils. In 2009, SVP was instrumental in passing the Omnibus Public Land Management Act of 2009 and, in particular, the Paleontological Resources Preservation Act section of that bill.

11.     To advance vertebrate paleontology, the Society: organizes an annual international scientific conference for its members; periodically sponsors symposia at other scientific conferences; distributes merit-based grants, fellowships, and awards for paleontological research, artwork, and educational outreach; establishes professional standards for the collection and curation of fossils, for the management of paleontological data, and for the documentation of paleontological

3

research; works with policymakers, lawmakers, and regulators in the United States and around the world to establish regulatory and legal protection of scientifically-valuable fossil resources; publishes the Journal of Vertebrate Paleontology; and raises funds to support the aforementioned activities.

### The Grand Staircase-Escalante National Monument

12.     Consistent with its constitutional mission, SVP has long been involved in the protection of paleontological resources on the land constituting the Grand Staircase-Escalante National Monument ("Grand Staircase Monument"). In fact, members of SVP were among the original advocates for the creation of the Grand Staircase Monument in 1996. SVP and its members conduct extensive paleontological field work within Grand Staircase, and its members have been active in documenting the Grand Staircase Monument's fossil resources since before President Clinton designated the Monument in a 1996 proclamation. Indeed, the research conducted by SVP members is specifically mentioned in both President Clinton's and President Biden's Proclamations related to the Grand Staircase Monument.

13.     The lands included within Grand Staircase have a wealth of unique and valuable paleontological resources, including a Permian-through-Triassic sequence in the Grand Staircase area, a Late Cretaceous sequence on the Kaiparowits Plateau, and another Triassic and Jurassic sequence in the Circle Cliffs and Escalante Canyons areas. And a high proportion of the lands within Grand Staircase Monument also show high or very high potential fossil yield.

14.     The Society and its members have a scientific interest in Grand

Staircase and actively work to enhance the scientific value and public appreciation of the paleontological resources at Grand Staircase Monument. Approximately 10% of SVP's members, including me—and over 100 in total—have either actively engaged in long-term research at Grand Staircase Monument or have made short-term research visits for field trips or site visits. As of November 1, 2022, thirty-two SVP members had active paleontological research sites within the boundaries of the Monument, and other members are actively planning to conduct research there in the near future.

15.     Members of the Society visit and regularly conduct paleontological field research within Grand Staircase and rely on its designation to protect the paleontological and geological resources upon which their professional scientific and research work, educational endeavors, and careers depend. Furthermore, members choose the Grand Staircase Monument as a place for research because of its scientifically-important vertebrate fossils and because its national monument status provides for the permanent protection of the field sites, which in turn guarantees future access for purposes of verifying previous data and conclusions.

16.     Additionally, SVP members train students in paleontological field techniques, conduct educational field trips, and contribute to public educational exhibits at the Grand Staircase Monument. SVP featured paleontology from the Grand Staircase Monument at its 2016 Annual Meeting, where it also organized field trips for 40 members on the stratigraphy and paleontology of the Kaiparowits Plateau.

17.     The Society's members have been active in documenting the

5

exceptional fossil resources at Grand Staircase Monument since 1996. Of the 56 authors of papers in a 2013 book about the paleontology of Grand Staircase Monument, 28 are SVP members or were members through large parts of their careers.[1] Similarly, 11 out of the 19 scientific papers about the paleontology of Grand Staircase Monument that were published in the last 12 months were authored by SVP members.

18.     On March 13, 2019, I testified before Congress regarding the Grand Staircase Monument's "profound impact on science," including the registration of over 2,000 vertebrate fossil specimens and the discovery of new fossil dinosaurs like the Lythronax, as well as fossil mammals, birds, lizards, snakes, plesiosaurs, fish, plants, and insects.[2] I also described how work at Grand Staircase Monument has informed our understanding of "how the Earth recovered from its largest extinction" and how Earth's "ecosystems became 'modern' because of the rise of flowering plants."

19.     In 2022, I wrote a paper for a journal called *Geological Curator* that explains the paleontological importance of the Grand Staircase Monument (as well as the Bears Ears Monument, as discussed below), the roles of SVP members in its scientific development, and the impacts of the Trump Proclamation's purported reduction of its boundaries. The paper will be published in December

---

[1] *See* AT THE TOP OF THE GRAND STAIRCASE: THE LATE CRETACEOUS OF SOUTHERN UTAH (Alan L. Titus and Mark A. Loewen, eds., Indiana University Press, 2013).
[2] Statement of P. David Polly, U.S. House Committee on Natural Resources (March 13, 2019), *available at* *https://naturalresources.house.gov/imo/media/doc/Polly,%20David%20-%20UPDATED%20Statement%20for%20the%20Record.pdf*.

6

2022.

20.     Serious vertebrate paleontological research on the lands that now make up the Grand Staircase Monument, as delineated in 1996, began with the work of Society members Jeff Eaton and Rich Ciffelli, who studied the Late Cretaceous microvertebrate faunas of the Kaiparowits Plateau starting in the early 1980s. The fossils they and their colleagues collected are curated at the University of Colorado, Oklahoma University, the Museum of Northern Arizona, and the Natural History Museum of Utah ("NHMU"), where they continue to be studied by Society members and, more broadly, by the international scientific community and interested members of the public. The next phase of research after the Grand Staircase Monument was established was surveying the entire property for vertebrate paleontological resources. SVP member Scott Sampson from the NHMU has conducted field research since around 2001 and member Joe Sertich from the Denver Museum has conducted field research for almost ten years. Other SVP members, such as Jacques Gautier and Marilyn Fox of Yale University, have also conducted research in the Triassic units, which led to the discovery of the most complete Poposaurus skeleton known to date (material that sheds light on the origin of dinosaurs).

21.     SVP has consistently opposed recent efforts to reduce the boundaries of Grand Staircase. Specifically, it opposed the monument review process that began in April 2017 and culminated in President Trump's December 4, 2017 Proclamation purporting to reduce the size of the Grand Staircase Monument by

approximately half.[3] SVP then filed suit against the President challenging the Proclamation, litigation which continues to this day. While this lawsuit was ongoing, SVP submitted comments opposing the new resource management plan which flowed from and sought to implement the reduction in protections engendered by the Trump Proclamation.

**SVP's Injury As To The Grand Staircase Monument**

22.     The Plaintiffs' theories in this case threaten the unique paleontological resources found within Grand Staircase, as well as the interests of SVP and its members in discovering, researching, and educating the public about those resources.

23.     According to the Bureau of Land Management's ("BLM's") own count, over 1,400 scientifically important fossil sites were excluded by former President Trump's 2017 Proclamation. Plaintiffs seek an even more significant reduction of the Grand Staircase Monument's boundaries, which could result in more than 2,700 fossil sites being excluded if the entire Monument were rescinded.[4]

24.     Following the Trump Proclamation, I observed the difficulties SVP members encountered when conducting paleontological research on the lands purportedly excluded by the Proclamation. Projects on active research sites that had previously been within Grand Staircase Monument's boundaries were suspended because of increased risks to the integrity and quality of the projects

---

[3] *See* Comments from Society of Vertebrate Paleontology, DOI-2017-0002-100908 (filed May 25, 2017), https://www.regulations.gov/document?D=DOI-2017-0002-100908 (follow Attachment "PDF" hyperlink at bottom of page) (last visited Nov. 7, 2019).
[4] *See* Exhibit E.

posed by increased ATV and vehicle use and other ground-disturbing activities. Granting the relief Plaintiffs request would likewise hamper the Society's research efforts, although likely to a greater degree.

25.     Moreover, if Plaintiffs are successful, SVP is gravely concerned about an increase in private mining activities on excluded lands. Should Grand Staircase's monument status be revoked, private individuals and corporations could, without prior notice or authorization, enter open public lands and use hand tools or portable suction dredges to collect rock, soil, and mineral species. These activities may permanently damage or destroy the unique paleontological resources that are now protected by President Biden's proclamation.

26.     Indeed, following the Trump Proclamation, the lands purportedly excluded from the Grand Staircase Monument were opened to mining and other resource extraction activities, as well as other ground disturbing activities. In just the period between February 2018 and November 2019, 16 mining claims were filed on purportedly excluded lands.

27.     For instance, mining operations began at a claim called "Creamsicle" during this period, as a local mining company called Penney's Gemstones sought to quarry the area for alabaster. BLM's own data show that the areas Penney's Gemstones mined have either "moderate" or "high" potential to contain paleontological resources that may be adversely affected by surface-disturbing activities.[5]

---

[5] See Bureau of Land Mgmt., Potential Fossil Yield Classification System 3 (July 8, 2016), available at https://www.blm.gov/sites/blm.gov/files/uploads/IM2016-124_att1.pdf.

28.     As a scientist and leader of SVP, I am concerned that, if Plaintiffs are successful, similar mining and other ground-disturbing activities will ensue and irreplaceable paleontological resources will be lost as a result.

29.     Changes in the boundaries or management of the Grand Staircase Monument also risk loss of funding to SVP members' research projects. Funding is currently available to SVP members and their collaborators through BLM's National Conservation Lands Scientific Studies ("NCLS") support program and other BLM funding sources. These funds support inventory surveys and other scientific research at the Grand Staircase Monument. Funds from the NCLS program are therefore available to support the costs of preparation, curation, and storage at approved research repositories. The proposed boundary changes will make valuable fossil sites ineligible for these and other funds, which will in turn impact the ability of SVP's members to conduct research.

30.     SVP members also risk loss of funding from sources other than BLM. The priority BLM currently places on the conservation and protection of paleontological resources, particularly on the Kaiparowits Plateau, allows SVP members to apply for grants for long-term projects that require assurances that paleontological sites will continue to be preserved and monitored. Any change to the Grand Staircase Monument that risks harm to its paleontological resources will diminish Grand Staircase's status as land dedicated to important scientific discovery and will impede SVP members from obtaining grant funding.

31.     Paleontological research at the Grand Staircase Monument is ongoing, and there is abundant evidence to indicate that it will continue to yield

scientifically-important results well into the future. To this day, researchers are making new discoveries at rates that indicate that the full inventory of the fossil taxa preserved at the Grand Staircase Monument has not yet been recovered. In scientific terms, this is referred to as the "steep side of the collection curve." A "collection curve" is a statistical way of looking at the number of taxa sampled relative to the amount of effort expended to recover them in the field. When researchers first study a new area, the number of new discoveries is large relative to the amount of time expended. As research continues, however, new discoveries become more rare. At Grand Staircase, researchers are still in the first phase of this "curve," which means that important scientific work should continue for decades or centuries in those areas, assuming the existence of the protective regime that Grand Staircase Monument affords. Such work is jeopardized in those areas without this protective regime.

32.     Continued monument status is also critical to the Society because it allows researchers to apply new methods and technologies old, well-studied sites. Monument status affords protections that preserve sensitive sites over long periods of time, and the policy governing scientific work at the Grand Staircase Monument has played an essential role in advancing research. For example, Daigo Yamamura of the University of Arkansas recently studied the paleoenvironment and paleoclimate of the Late Cretaceous era using new stable isotope analytic techniques. His research was based on earlier collections housed at the NHMU, which he then verified by sampling sediments from the original sites at the Grand Staircase Monument. He was able to carry out this research

because of the precise locality information available for the previously-collected specimens, which is mandated by the Grand Staircase Monument's scientific work policy, and because he was able to revisit the same sites, which remained intact. Similarly, SVP member Eric Roberts has been able to develop a refined chronology for the geological units at the Grand Staircase Monument by applying new uranium-lead dating techniques at the sites where the original stratigraphic framework was developed. Elimination of extensive areas of Grand Staircase's protections will irreparably harm the ability of Society members to perform paleontological research in the area.

33.    Because the exceptional paleontological resources were objects specifically protected under the Clinton Proclamation, preservation of those resources is prioritized over many other potentially conflicting uses of the land. Members of the Society rely on the fact of permanent protection to secure financial resources necessary to conduct research, as grant distributors are unwilling to support projects whose resources may be compromised, or whose sites may be altered or rendered inaccessible over time. The special status of paleontological resources also justifies employing professional paleontological staff at the Grand Staircase Monument who coordinate activities among research groups and organize protection efforts. Finally, national monument status ensures broad access by the scientific community and the interested public to Grand Staircase's fossils and their associated data.

34.    All of these features enhance the quality of research Society members conduct. Society members' current and future use and enjoyment of

these areas are therefore integrally intertwined with the Grand Staircase Monument's sensitive resources, and its fossil resources in particular, and are affected by the condition of the areas and the delineation and effectiveness of its resource protections. Furthermore, the Society's broader educational mission to inculcate an appreciation for paleontology among amateur scientists and the general public would be harmed if the Plaintiffs are successful in removing monument protections from the lands that constitute Grand Staircase.

35.     SVP has a keen interest in protecting the President's powers under the Antiquities Act and in preserving President Biden's 2021 proclamation reestablishing the boundaries of Grand Staircase Monument.

36.     My interests, along with the interests of SVP and its other members around the country, would therefore be seriously harmed if this Court ruled in Plaintiffs' favor.

**The Bears Ears National Monument**

37.     SVP and its members, including myself, have also devoted substantial time and resources to protect paleontological resources within the Bears Ears National Monument ("Bears Ears Monument") . SVP has focused its advocacy efforts on recognizing paleontology as a value to be protected by the Bears Ears Monument's designation. Through our experiences with the designation of Grand Staircase Monument, SVP learned that recognition prompts federal agencies to prioritize paleontological research over other uses of the land, and enhances funding opportunities for our members to conduct research through the BLM's National Landscape Conservation System.

13

38.     On November 16, 2016 in my capacity as President of SVP, I submitted a letter on behalf of SVP to the President of the United States, the Secretary of the Interior, the Director of the BLM and the Secretary of Agriculture urging them to establish the Bears Ears Monument in order to protect paleontological resources.[6]  Language from our letter appeared in President Obama's 2016 proclamation establishing the Bears Ears Monument.

39.     More recently, I submitted comment letters, dated May 25[7] and July 9[8] of 2017, urging that the original boundaries of the Bears Ears Monument be expanded and highlighting the importance of the protections provided by the Bears Ears Monument status. And on November 14, 2018, I submitted comments on behalf of SVP to the BLM and the U.S. Forest Service regarding the draft Bears Ears Monument Management Plan and Environmental Impact Statement for the Shash Jáa and Indian Creek units of the Bears Ears Monument. And on October 31, 2022 I submitted comments on behalf of SVP to the BLM on scoping for a revised Bears Ears Monument Management Plan and Environmental Impact Statement for the restored Bears Ears Monument, including nomination of a new Area of Critical Environmental Concern in Johns Canyon in the southern part of the monument that had been excluded by the Trump

---

[6] A true and correct copy of this letter is attached as Exhibit A.
[7] A true and correct copy of this letter is available at https://www.regulations.gov/document?D=DOI-2017-0002-100908 (follow Attachment "PDF" hyperlink at bottom of page).
[8] A true and correct copy of this letter is available at https://www.regulations.gov/document?D=DOI-2017-0002-655559 (follow Attachment "PDF" hyperlink at bottom of page).

administration to conserve newly discovered Paleozoic sites.

40.      Since December 2017, when President Trump issued a Proclamation dramatically reducing the size of Bears Ears Monument, SVP has devoted additional time and resources to organizing public events related to educating the public and public officials on the effects of the Trump Proclamation on paleontological science. For instance, on March 13, 2019, I testified before the U.S. House Committee on Natural Resources to highlight the paleontological effects of improper alteration of national monuments, including the Bears Ears Monument.

41.      In December 2017, following the announcement of the Trump Proclamation dramatically reducing the size of Bears Ears Monument, SVP joined Utah Diné Bikéyah, Friends of Cedar Mesa, Archaeology Southwest, Conservation Lands Foundation, Inc., Patagonia Works, The Access Fund, and the National Trust for Historic Preservation as plaintiffs in a lawsuit filed in the United States District Court for the District of Columbia challenging the Trump Proclamation. That lawsuit alleged that the Trump Proclamation exceeded the President's authority under the Antiquities Act, and sought a declaration that the Trump Proclamation was unlawful. SVP, along with its partner organizations, has been part of that litigation for nearly four years. That litigation is still pending in the District of Columbia.

42.      Since November 2018, I have made presentations on behalf of SVP in Bloomington, Indiana; Indianapolis, Indiana; Belfast, Maine; Riverside, California; Austin, Texas; Brisbane, Australia; Storrs, Connecticut; and New

Haven, Connecticut and have talked to reporters from *Nature*, *Science*, the BBC, Associated Press, *Sierra Sun Times*, *Salt Lake Tribune*, and *Washington Post* to educate the public on the numerous effects of funding cuts to paleontological science.

43.     In collaboration with the BLM, SVP members have also participated in educational outreach activities regarding the quality of paleontological research at Bears Ears Monument before and after its designation. Several highly fossiliferous areas, each with many individual sites, including Indian Creek, Dark Canyon, Red House Cliffs, John's Canyon, Moqui Dugway, and the Valley of the Gods, were originally within the boundaries of the Bears Ears Monument as designated by President Obama and President Biden, but were stripped of monument protection by the Trump Proclamation. SVP members, including myself, have undertaken educational outreach efforts to highlight the harms to paleontological research stemming from the removal of monument protections from the land.

44.     SVP members also regularly visit Bears Ears Monument to conduct research on paleontological resources within the boundaries set forth in the Biden Proclamation. SVP members have also published extensively on paleontological research within that area. As of November, 2022 there are 21 SVP members with active projects in Bears Ears Monument and another 5 who are planning projects in the near future. I use paleontological and geological data from the Bears Ears Monument regularly in my research and teaching, especially from the Valley of the Gods and Grand Gulch areas.

45.    There are a number of fascinating and paleontologically important sites in the Bears Ears area, but four recent discoveries stand out in my mind as the most important and emblematic of this area's great potential. The first is the aptly named "Hills Have Teeth," where SVP members have discovered hundreds of fossils of reptile teeth so far. The site is the most productive and diverse Triassic microvertebrate site in the state of Utah—and very likely one of the top ten most productive and diverse sites nationwide from this time period. Another major finding from the region is a collection of some the oldest footprints ever discovered in the southwestern part of the country. These footprints represent some of the northernmost occurrences we have seen of the phytosaur trace *Apatopus*, and the aetosaur trace *Brachycheirotherium* in the United States. Third, in 2017, by White Canyon, at the far western edge of the Bears Ears Monument boundary as designated by the Biden Proclamation, we discovered a site containing several large, unidentified, enigmatic bones. As discussed below, this site was discovered as the result of research being conducted with funding from a federal grant under the BLM's NCLS program, which SVP members were able to apply to this area while it was contained in the boundaries of the Bears Ears Monument. We cannot yet tell what kind of animal the bones belonged to because it has not been fully excavated, but this is a prime area for further exploration and research. Finally, in the 2016 field season, we discovered what is likely the most important Triassic fossil site in the state of Utah, known as P2N. This site is nearly sixty-three meters square—one of the largest in the world from this age—and incredibly dense with rare paleontological resources. The site was looted several years before the Bears

17

Ears Monument was declared, and the looters removed the skull of an animal known as a phytosaur. This type of phytosaur, *Pravusuchus*, was only first described in 2010 and has only been previously reported from several skull fragments in Arizona. This location represents the only known complete skeletons from this animal. Only recently was this missing piece rediscovered and reunited with the rest of the animal, now housed at the NHMU. This site represents the opportunity for completely new scientific discoveries—things which we may never see again unless the site is adequately protected. There are decades of research to do before this site has been fully explored.

46.     Equally important as the fossils themselves is the geological context in which they sit. The rocks and other formations that surround a given fossil allow paleontologists to understand the world in which the creature once lived—its rainfall, temperature, and climate. Further, one of the most important ways to understand the biological, climatological, and environmental context of large vertebrate-paleontological sites is through the existence of invertebrate and plant fossils found at the site. Thus, without protection for the geological context and invertebrate and plant fossils throughout the Bears Ears region, we will miss out on so much we could learn from the rich and unique paleontological resources on site.

## SVP's Injury As To Bears Ears

47.     The Trump Proclamation harmed the paleontological research conducted by SVP's members in the Bears Ears Monument. As noted, the Trump Proclamation

stripped the Bears Ears Monument protection from several areas with large quantities of fossils, including Indian Creek, Dark Canyon, Red House Cliffs, John's Canyon, Moqui Dugway, and the Valley of the Gods. The White Canyon site and P2N also fell outside of the boundaries of the Bears Ears Monument as designated by President Trump.

48.   The removal of monument protections from these lands posed a direct threat to the research SVP's members conducted. Casual collection of paleontological objects was prohibited in these areas when they were part of Bears Ears Monument, but was no longer prohibited following the Trump Proclamation because casual collection is permitted on non-monument lands. Such collection frequently destroys the geological context of the surrounding area and harms paleontological research and resources. As noted, plant and invertebrate fossils provide important contextual information because they allow paleontologists to understand the world—the time period, the climate, the environment, and the biological context—in which the creature once lived. Casual collection activities often results in the removal of these plants and fossils from the land, and thereby decreases the amount of information that can be gathered from a particular fossil site. Casual collection can be incredibly damaging if it is allowed to persist. Over time, if uninterrupted, casual collection could lead to the depletion of the paleontological resources found within the Bears Ears Monument as individuals remove such items from the Bears Ears Monument. In the past, for example, casual collection has led to the depletion of resources at some of the richest paleontological

sites in the country.[9]  I fear that, if casual collection is allowed to continue, the resources that make Bears Ears so noteworthy may similarly be threatened.

49.    Several sites continue to be at high risk. The Butler Wash track site was literally cut in half by the boundary line of Trump's reduced monument, with half of the trackways remaining inside the monument and the other half outside. This site is well known to hikers and tourists and is easily accessible from the road from Blanding. Damage is frequent, sometimes caused with innocent intention by passers-by who wish to make plaster casts of footprints, so an information sign has been erected to educate visitors about responsible stewardship, as well as about the tracks themselves. A trackway at Shay Canyon, which is also easily accessible from the road and widely advertised on outdoor sites, has been heavily damaged and perhaps entirely destroyed since President Trump enacted his changes in management. The entirety of Bears Ears contains similarly valuable paleontological resources, many of which are probably suffering similar damage that is as yet undetected because of the lack of systematic surveying and monitoring that should have been put into place after the Bears Ears Monument was established in 2016.

50.    President Trump's actions also directly and negatively affected both SVP as an organization and SVP's members, including myself. As a result of President Trump's actions, SVP diverted the time and resources of its leadership and members to participate in educational outreach efforts about the effects of the Bears

---

[9] *See* Vincent Santucci & Cassi Knight, *Fossil Cycad National Monument*, Nat'l Park Service, https://www.nps.gov/articles/fossil-cycad-national-monument.htm (last visited Nov. 9, 2021).

Ears Monument reduction to paleontological research. At a minimum, I have spent 975.5 hours addressing issues related to the Bears Ears and Grand Staircase Monuments since the Trump Proclamation, and at least three others in the organization have devoted at least 200 hours each to those issues. If not for the Trump Proclamation, the time spent on these issues would have been dedicated to other efforts.

51.   President Trump's actions also impaired SVP's ability to educate the public about paleontological resources by reducing the ability of SVP members to design, obtain funding for, receive support during, and publish on research conducted in the areas excised from the Bears Ears Monument by the Trump Proclamation. Indeed, the Trump Proclamation hindered the ability of SVP members to obtain funding and other support to continue their research and discovery of scientifically important objects within the areas excluded by the Trump Proclamation.

52.   Most notably, SVP's members were no longer able to take advantage of funding from the NCLS program in the areas excluded from the Bears Ears Monument by the Trump Proclamation. This funding is only available for work on lands in the National Landscape Conservation System. The areas excluded from the Bears Ears Monument by the Trump Proclamation, however, were also excluded from the National Landscape Conservation System. As discussed above, NCLS funding is often critical to SVP members' ability to perform their research, and the inability to acquire this funding directly harmed the ability of SVP's members to continue their paleontological work in the excised areas.

21

53.   Not only did the Trump Proclamation make it more difficult to conduct research on site in the future, but it also eliminated critical funding streams important to research by SVP members that was already underway at the time the Trump Proclamation entered into effect.

54.   By revoking the Bears Ears Monument, President Trump made the White Canyon and P2N sites, as well as many of the richest and most important sites in the area, ineligible for additional NCLS funds.

55.   For example, in 2017, a member of SVP, Robert Gay, applied for an NCLS grant through the Museum of Western Colorado to conduct work within the area protected by the Obama Proclamation. The Museum of Western Colorado received a May 2, 2017 letter from the Department of the Interior indicating that the grant had been awarded and the application accepted based upon Mr. Gay's submitted terms. The award was made to the Museum of Western Colorado, which served as the fiscal agent for the grant.[10]  The grant became effective on April 24, 2017, and could be used for work performed through April 30, 2022, as detailed in the grant and cooperative agreement. The terms of the grant reward expressly limited Gay's field work to the boundaries of the Bears Ears Monument.[11]  Mr. Gay worked under this grant beginning in the summer of 2017. An October 3, 2018 federal financial support submitted by Erik Vlick of the Museum of Western Colorado indicated that the grant was an NCLS grant.[12]  Mr. Gay had planned to

---

[10] A true and correct copy of this award letter is attached as Exhibit B.
[11] A true and correct copy of this agreement is attached as Exhibit C.
[12] A true and correct copy of this report is attached as Exhibit D.

use the grant and matching funds to continue excavations in White Canyon and P2N during 2018.

56.   Following the Trump Proclamation, however, Mr. Gay did not conduct any additional research or excavation at the White Canyon site and instead focused his work on different areas included within the new monument units designated by President Trump. Further, NCLS funding had been, by a significant margin, his most important source of funding for several years prior to the Trump Proclamation. Mr. Gay's grant money was exhausted by the end of 2018, and he was not able to apply for additional NCLS funding to further his research at P2N and the White Canyon site, which he previously had concrete intentions of doing.

57.   Mr. Gay was not alone. At least 22 SVP members had ongoing research interests in the areas that were excluded from the Bears Ears Monument by the Trump Proclamation. Approximately forty percent of the currently known paleontological sites of scientific importance at Bears Ears were removed from the Bears Ears Monument by the Trump Proclamation. These SVP members were no longer eligible for research funding from National Landscape Conservation System for work at these or other sites that were excluded from the Bears Ears Monument. Indeed, while the Trump Proclamation remained in effect, the reduction of funding available to them for research in the Bears Ears Monument areas meant that the research could not ramp up in the way SVP members intended. As a result, this research was less fruitful and yielded less scientific value than it would have been had these lands continued to be part of the Bears Ears Monument. The combined effects of these changes made it more difficult for many SVP members, including

23

Mr. Gay, to design new research, obtain grant funding for that research, and to complete the research by archiving fossil specimens and publishing papers.

58.   Other researchers abandoned their focus on Bears Ears altogether due to the Trump Proclamation. For example, one SVP member conducted research in the Bears Ears area as part of her PhD program, and planned to continue her work as the paleontological manager for the Bears Ears Monument once a scientific management plan was in place. Due to the Trump Proclamation, however, no such scientific management plan was developed, and this researcher has been forced to focus her research elsewhere even though she would like to return her focus to Bears Ears. Other paleology researchers have either left the field entirely or shifted their attention away from Bears Ears land management issues, at least in part due to the Trump Proclamation and the challenges it posed for protecting the Monument.

59.   President Trump's actions also affected SVP members' ability to obtain funding from non-BLM sources. Private foundations and institutional grantors are more willing to fund research in lands that have been granted national monument status. This is due at least in part to the protections national monument status provides. Without a guarantee that the paleontological resources for which funding has been made available will be protected and preserved throughout the project, funders are less willing to invest in our research.

60.   President Trump's actions affected Mr. Gay's ability to obtain funding for proposed projects from non-BLM sources. In November of 2017, in the lead up to

the Trump Proclamation, Mr. Gay was denied a funding grant from Canyonlands Natural History Association to draft a visitor's guide to paleontological resources within the Bears Ears Monument. The idea behind the project was to produce an accessible public-audience book about the paleontology of the Bears Ears area to help promote education and preservation. The Association informed Mr. Gay that while the project sounded interesting, they did not want to fund it at that time due to the controversy surrounding the Bears Ears Monument.

61. Ultimately, President Trump's action revoking monument status for many of the areas where Mr. Gay and other SVP-members focus their research diminished the number and size of grants provided by non-profit and scientific institutions, which in turn affected the number of researchers they can support. And as described above, the Trump Proclamation made many of the areas in which SVP conducts research ineligible for additional NCLS funding. Without funding from either private sources or the BLM, SVP's work had to stop at some of the country's greatest paleontological sites, whose resources went undiscovered and unappreciated.

62. Moreover, in light of the Trump Proclamation, the specialized management structures that had been placed across the entire Bears Ears Monument under the original Obama Proclamation were limited to the Shash Jáa and Indian Creek units. Monument managers often provide crucial information regarding recent activity in a monument area, and they also have scientific expertise. SVP-members' research in the areas excised from the Bears Ears Monument by the Trump Proclamation suffered because SVP members could not

take advantage of these resources in those areas.

63.    If Plaintiffs prevail in their lawsuit challenging the Biden Proclamation, SVP would experience many of the same harms it suffered after the Trump Proclamation dramatically reduced the size of the Bears Ears Monument. Should Plaintiffs win their lawsuit, the protections conferred by the Biden Proclamation would likely disappear, exposing SVP to the same harms to its interests that it experienced following the Trump Proclamation. Indeed, because Plaintiffs appear to argue that even the Trump Proclamation was unlawful, SVP would suffer even more substantial harm if Plaintiffs' succeeded that it suffered following the Trump Proclamation.

64.    Specifically, if Plaintiffs prevail, highly fossiliferous areas—including Indian Creek, Dark Canyon, Red House Cliffs, John's Canyon, Moqui Dugway, and the Valley of the Gods—may once again lose monument protection. Important paleontological sites such as White Canyon and P2N would also lose monument protection. As a result, casual collection of paleontological objects in these areas would no longer be prohibited. That threatens the paleontological research of SVP's members, as such collection often destroys the geological context of the surrounding areas and thereby harms paleontological research and resources.

65.    Plaintiffs' lawsuit and the Trump Proclamation asserted that these sites are adequately protected by the Paleontological Resources Preservation Act of 2009, but that statute merely makes collecting vertebrate fossils illegal without a scientific permit, it does not prioritize paleontological resources over competing uses, it does not make them eligible for National Conservation Lands funding, and

26

it permits the casual collection of plant and invertebrate fossils which risks destroying the context of scientifically important vertebrate sites like those in Bears Ears.

66.   Plaintiffs' lawsuit, if successful, would also force SVP to divert the time and resources of its leadership and members to participate in educational outreach efforts regarding the effects of monument reduction on paleontological research, much as SVP did following the Trump Proclamation. And it would once again impair SVP's ability to educate the public about the rich paleontological resources in the region by reducing the ability of SVP members to design, obtain funding for, and public research in the areas that are now protected by the Biden Proclamation but that were not protected under the Trump Proclamation.

67.   If Plaintiffs prevail in their lawsuit challenging the Biden Proclamation, SVP's members would no longer be able to take advantage of funding from the NCLS in the areas that are no longer part of the Bears Ears Monument, directly harming the ability of SVP's members to continue their paleontological work in lands that would no longer be protected by the Biden Proclamation.

68.   Indeed, because BLM's NCLS grant program is an important source of funding for studying paleontological resources on public lands that have received monument protection, that study enhances the value of these resource for the American public. Almost all of the paleontologists working in the Bears Ears area are SVP members. Teams from Utah are planning research in the northern Lockhart Basin part of the monument, teams from Colorado in the western White Canyon area, and teams from California in the southern Valley of the Gods regions.

27

Therefore, Plaintiffs' lawsuit threatens the ability of SVP's members to conduct their research, and it erodes the value of the unique paleontological resources that are currently protected by the Biden Proclamation but that were not protected under the Trump Proclamation. Much as was true while the Trump Proclamation was in effect, the scale of research by SVP members and the coordination of their research efforts would again be affected in the areas that lose monument protection in the event that Plaintiffs' lawsuit is successful.

69.   If Plaintiffs prevail, that will also affect the ability of SVP's members to obtain funding from non-BLM sources, such as private foundations and institutional grantors. As SVP members found following the Trump Proclamation, these non-BLM sources are more willing to fund research in lands that have national monument status, and less willing to fund research when there is controversy or uncertainty surrounding the monument's status. Thus, Plaintiffs' lawsuit, if successful, would likely reduce the availability of funding from these sources.

70.   Plaintiffs' lawsuit, if successful, would also deprive SVP's members of the benefit of specialist BLM monument managers who can proactively survey for scientifically important paleontological resources, recruit researchers to study those resources, and coordinate the synthesis and interpretation of the findings made by all of the researchers who work there. Those resources are available only on monument lands. If Plaintiffs prevail, the research of SVP members would suffer in the areas that are no longer protected by the Biden Proclamation, as SVP members could no longer take advantage of these BLM resources in those areas.

I declare under penalty of perjury that the foregoing is true and correct.

28

Executed this 23rd of November, 2022.

_____

P. David Polly

**EXHIBIT A**



**Society of Vertebrate Paleontology**

9650 Rockville Pike • Bethesda, MD
20814-3998 Phone: (301) 634-7814 •
Fax: (301) 634-7455
Email: svp@vertpaleo.org • Web:
www.vertpaleo.org FEIN: 06-0906643

16 November 2016

**Subject: Protect paleontological resources at Bears Ears and Indian Creek**

To the President of the United States of America, the Secretary of the Interior, Director of the Bureau of Land Management, the Secretary of Agriculture, and Chief of the Forest Service:

We are writing as the Executive Officers of the Society of Vertebrate Paleontology (SVP), a nonprofit scientific organization with over 2,000 professionals, amateurs, and students worldwide (http://www.vertpaleo.org ), about the Bears Ears and Indian Creek areas in of Utah, which have been proposed to be designated as either a National Monument designated by the U.S. President (http://www.bearsearscoalition.org/ ) or two National Conservation Areas through a proposed congressional bill (Utah Public Lands Initiative: http://www.utahpli.com/ ).

Our Society welcomes either solution because both would help protect another important national heritage resource that is not yet mentioned in the proposals: the world-class fossils and fossil sites (= paleontological resources) in the Bears Ears and Indian Creek areas. These public lands contain scientifically important fossil resources that are only now beginning to be studied, some of which are in danger of being lost to the nation and to the science through piecemeal sale of state and private land. We hope that the entire area can be brought under the Paleontological Resources Preservation Act (PRPA), which is part of the Omnibus Public Land Management Act of 2009 (Public Law 111-011. P.L. 111-011, Title VI, Subtitle D on Paleontological Resources Preservation; 123 Stat. 1172; 16 U.S.C. 470aaa).

We are especially concerned that the importance of paleontological resources be mentioned in the acts that establish protective status for Bears Ears and Indian Creek. Like cultural and archaeological heritage, paleontological resources from the Bears Ears and Indian Creek areas are exceptionally important and must be carefully managed for both the protection of the fossil sites and legal study and collection by qualified scientists for research, preservation, and education. Many vertebrate fossil

discoveries already made in the area are the only examples of their kind in the country or the world, including new species of extinct fish, amphibians, mammal-relatives, and reptiles. Researchers from the Smithsonian Institution have also uncovered important plant fossils from the same areas. Collectively these data provide critical information about the history of North America that are not available anywhere but Bears Ears and Indian Creek.

Much of the area is already on Department of Interior or USDA Forest Service land, and therefore will be covered by the protections provided for paleontological resources in PRPA. However, paleontological research at Bears Ears and Indian Creek has already demonstrated the scientific importance of the fossil resources there, and we are concerned that its absence in the proposals might place paleontological research in low priority relative to other uses. We therefore urge you to add paleontological resources to the language of any founding act that might be adopted as an important reason why these areas are being protected.

The nearby Grand Staircase-Escalante National Monument serves as a model for how such language has positively affected fossil resources. The Monument has produced many world class fossils, which are now in public trust for preservation, research, and education purposes, in large part because the importance of the paleontological resources was emphasized in the founding Presidential executive order. We request that a similar set of provisions to protect paleontological resources of the Bear Ears and Indian Creek areas must be included regardless of the type of national designation.

Appended to this letter is a paragraph about the paleontological resources of Bears Ears and Indian Creek that could be inserted into an act of preservation. If needed, SVP would be happy to provide any additional information pertaining this matter.

Sincerely yours,

P. David Polly
President, The Society of
Vertebrate Paleontology

Emily J. Rayfield
Vice President, The Society of
Vertebrate Paleontology

John A. Long
Past President, The Society of
Vertebrate Paleontology

*Suggested wording for act of preservation*

The [*National Monument/National Conservation Area*] includes world-class paleontological resources. The Valley of the Gods area includes some of the earliest vertebrates to walk on land in America, as well as exquisitely preserved leaf fossils and petrified wood. Cedar Mesa exposes strange burrows from early mammal relatives that are still poorly understood. Fossil evidence exposed along the Honaker Trail provides evidence that this arid landscape was once part of a thriving coral reef during the Pennsylvanian Period. Red Canyon, Elk Ridge, the Bears Ears, Comb Ridge, and Indian Creek preserve one of the most extensive records of the Triassic Period, the beginning of the "Age of Dinosaurs." Fossils from the Moenkopi Formation at Indian Creek provides evidence for the ecology of the large carnivorous amphibians called mastodontosaouroids, and the geologically younger Chinle Formation has produced fossil plants, crayfish and their burrows, and a variety of extinct amphibians and reptiles, such as metoposaurs, phytosaurs, crocodylomorphs, and dinosaurs. The Wingate, Kayenta, and Navajo Formations contain one of the best records of the Triassic-Jurassic transition anywhere in the world, providing crucial information for paleontologists seeking to understand how dinosaurs came to dominate terrestrial ecosystems during the Mesozoic Era.

**EXHIBIT B**




United States Department of the Interior

BUREAU OF LAND MANAGEMENT
Utah State Office

May 2, 2017

(ii)      **In Reply Refer To:**

1511 (UT-952)

Museum of Western Colorado Attn:
Peter Booth
462 UTE
Grand Junction, CO 81501-2516

Subject:            BLM-UT, Survey of Paleontological Resource of the Bears Ears National
Monument Financial Assistance Funding Opportunity No. L17AS00001

Dear Mr. Booth,

Congratulations! Enclosed is a copy of Cooperative Agreement No. L17AC00057 awarded in
response to your application for Federal Financial Assistance under the subject opportunity.
Acceptance of a financial assistance award from the Bureau of Land Management (BLM)
carries with it the responsibility to be aware of and comply with the terms and conditions of
award.
Acceptance is defined as the start of work, drawing down of funds, or accepting the award
via electronic means. Awards are based on the application submitted to, and as approved by
the BLM and are subject to the terms and conditions incorporated therein either directly or
by reference.

Please carefully read the entire agreement and take special note of the performance goals and
measures, the period of performance, the payment process, the reporting requirements and
due dates, and any Special Terms & Conditions. Periodic submission of Financial Reports (SF-
425), Performance Reports, and Youth Employment Reports are required under the Terms
and Conditions of this agreement. Please contact your BLM Program Officer (PO) with any
questions (contact information is listed on the award cover sheet).

Sincerely,

Melanie Beckstead
Grants Management Officer

Enclosures:          Cooperative Agreement

cc:      BLM Program Officer (PO)

**EXHIBIT C**

| Grant and Cooperative Agreement | | | | CHOOSE ONE: |
|---|---|---|---|---|
| ☐ | ☐ | ☐ | ☐ | X COOPERATIVE AGREEMENT ☐ GRANT |

| CHOOSE ONE: | EDUCATION | FACILITIES | RESEARCH | SDCR | TRAINING |
|---|---|---|---|---|---|

| 1. GRANT/COOPERATIVE AGREEMENT NUMBER L17AC00057 | 2. SUPPLEMENT NUMBER | 3. EFFECTIVE DATE 04/24/2017 | 4. COMPLETION DATE |
|---|---|---|---|

| 5. ISSUED TO NAME/ADDRESS OF RECIPIENT (No., Street, City/County, State, Zip) MUSEUM OF WESTERN COLORADO Attn: ATTN GOVERNMENT POC 462 UTE GRAND JUNCTION CO 81501-2516 | 6. ISSUED BY    BLM UT-STATE OFC ADM SVCS BR(UT952) **Mailing Address:** 440 WEST 200 SOUTH, SUITE 500 SALT LAKE CITY UT 84101 |
|---|---|
| 7. TAXPAYER IDENTIFICATION NO. (TIN) | 9. PRINCIPAL INVESTIGATOR/ORGANIZATION'S PROJECT OR PROGRAM MGR. (*Name & Phone*) Peter Booth, 970-242-0971 |
| 8. COMMERCIAL & GOVERNMENT ENTITY (CAGE) NO. 3L7F9 | pbooth@westcomuseum.org |

| 10. RESEARCH, PROJECT OR PROGRAM TITLE BLM Utah Survey of Paleontological Resources of the Bears Ears National Monument |
|---|

| 11. PURPOSE See Schedule |
|---|

| 12. PERIOD OF PERFORMANCE (*Approximately*) 04/24/2017 through 04/30/2022 |
|---|

| 13A. | AWARD HISTORY | 13B. | FUNDING HISTORY |
|---|---|---|---|
| PREVIOUS | $0.00 | PREVIOUS | $0.00 |
| THIS ACTION | $24,871.00 | THIS ACTION | $24,871.00 |
| CASH SHARE | $0.00 | **TOTAL** | $24,871.00 |
| NON-CASH SHARE | $0.00 | | |
| RECIPIENT SHARE | $142,912.00 | ☐ | ☐ |
| ☐   **TOTAL** | $24,871.00 | ☐ | |

| 14. ACCOUNTING AND APPROPRIATION DATA 01 |
|---|

| PURCHASE REQUEST NO. | JOB ORDER NO. | AMOUNT | STATUS |
|---|---|---|---|
| 0020123237 | | | |

## 15. POINTS OF CONTACT

| | NAME | MAIL STOP | TELEPHONE | E-MAIL ADDRESS |
|---|---|---|---|---|
| TECHNICAL OFFICER | ReBecca Hunt Foster | | 435-259-2179 | rhuntfoster@blm.gov |
| NEGOTIATOR | | | | |
| ADMINISTRATOR | Melanie Beckstead | | (801) 539-4169 | mbeckstead@blm.gov |
| PAYMENTS | | | | |

## 16. THIS AWARD IS MADE UNDER THE AUTHORITY OF :

Federal Land Policy and Management Act of 1976 (FLPMA), 43 USC 1737, PL 94-579, as amended. Section

| 17. APPLICABLE STATEMENT(S), IF CHECKED: | 18. APPLICABLE ENCLOSURE(S), IF CHECKED: |
|---|---|
| NO CHANGE IS MADE TO EXISTING PROVISIONS | PROVISIONS          SPECIAL CONDITIONS |
| FDP TERMS AND CONDITIONS AND THE AGENCY-SPECIFIC REQUIREMENTS APPLY TO THIS GRANT | REQUIRED PUBLICATIONS AND REPORTS |

| **UNITED STATES OF AMERICA** | **COOPERATIVE AGREEMENT RECIPIENT** | |
|---|---|---|
| CONTRACTING/GRANT OFFICER  Melanie Beckstead | DATE | AUTHORIZED REPRESENTATIVE | DATE |

**Grant and Cooperative Agreement**

| ITEM NO. (A) | ITEM OR SERVICE (Include Specifications and Special Instructions) (B) | QUANTITY (C) | UNIT (D) | ESTIMATED COST | |
|---|---|---|---|---|---|
| | | | | UNIT PRICE (E) | AMOUNT (F) |

CFDA Number:     15.224

DUNS Number:     086342235

Funding Opportunity Number:

L17AS00001 Required Cost

Sharing/Matching: None Indirect Cost

Rate: 8.8%

Required Periodic Status Reporting

Performance Reports: Annual

SF425 Financial Reports: Quarterly

E-mail Reports To:

BLM_UT_Financial_Assistance@blm.gov

Refer to Attachment No. 1 for Award Terms and

Conditions

11. PURPOSE:

This cooperative agreement is made and entered

into by the Department of the Interior, Bureau of

Land Management, the Utah State Office (BLM),

and Museums of Western Colorado, the recipient,

for the purpose of the BLM Utah Survey of

Paleontological Resources of the Bears Ears

National Monument project, transferring

something of value to the recipient to carry out a

public purpose of support or stimulation

authorized by a law of the United States.

Acceptance of a Federal Financial Assistance

award from the Department of the Interior (DOI)

carries with it the responsibility to be aware of

and comply with the terms and conditions of

award.  Acceptance is defined as the start of

work, drawing down funds, or accepting the

award via electronic means.

BLM substantial involvement by the BLM

Program Officer (PO) will be collaborate with the

Recipient to manage all stages of project

development, implementation, and evaluation.

Responsibility for project management, control,

Continued ...

**Grant and Cooperative Agreement**

| ITEM NO. (A) | ITEM OR SERVICE (Include Specifications and Special Instructions) (B) | QUANTITY (C) | UNIT (D) | ESTIMATED COST | |
|---|---|---|---|---|---|
| | | | | UNIT PRICE (E) | AMOUNT (F) |

| | | | | | |
|---|---|---|---|---|---|
| 00010 | and direction will be shared by the recipient and the BLM, however the BLM will have the right to intervene by modifying the project management plan if the project is not staying on schedule and/or technical issues arise.<br>Legacy Doc #: BLM<br>Delivery Location Code:<br>0004276660 BLM-UT MOAB<br>FIELD OFFICE*<br>82 EAST<br>DOGWOOD<br>MOAB UT<br>84532 US<br><br>Account Assignm: K G/L Account: 6100.411C0<br>Business Area: L000 Commitment Item: 411C00<br>Cost Center: LLUTY02000 Functional Area:<br>L18300000.XM0000 Fund: 16XL1109AF Fund<br>Center: LLUTY02000 Project/WBS:<br>LX.SS.J0610000 PR Acct<br>Assign: 01<br>Period of Performance: 04/24/2017 to 04/30/2022<br><br><br>Museums of Western Colorado<br>Obligated Amount: $24,871.00<br><br><br><br>The total amount of award: $24,871.00.<br>The obligation for this award is<br>$24,871.00. | | | | 24,871.00 |

BLM Agreement No.  L17AC00057                                           **Attachment No. 1**
Recipient Name: Museums of Western Colorado                            (Pg.  PAGE 10 of 23)
Project Title: BLM Utah Survey of Paleontological Resources of the Bears Ears National Monument

## 1.  COOPERATIVE AGREEMENT OBJECTIVES:

### A.  Objective(s):

The objective of this agreement is to form a partnership between BLM Utah and the Museums of Western Colorado to conduct a preliminary, systematic inventory of the available rock outcrops from the Triassic/Jurassic transition. This inventory will provide an understanding of the fossil resources present within the Bears Ears National Monument. This inventory will also provide information on how best to protect those resources and will study their significance to the prehistoric history of Utah and America in general.

### B.  Public Benefit(s)

This inventory will provide significant value to the public because the fossils discovered by it are the foundation for internationally-recognized scientific research. Additionally, these fossils will reach tens of thousands of people in the state of Colorado, nationwide, and internationally through our museum exhibits, public programs, school programs, and the resultant popular media exposure.

### C.  Federal Award Performance Goals

*Spring 2017:* Background research, planning, and coordination with BLM field offices and interim management of BENM.
*Summer 2017:* Fieldwork in BENM to inventory fossil resources. Tasks include systematic prospecting to identify new fossil sites, evaluation of these sites, and excavation of those sites under risk. This work will be undertaken by crews of trained staff and volunteers from the MWC and Utah Friends of Paleontology.
*Fall 2017:* Preparation and curation of collected specimens at the MWC.
*Winter 2016-2017:* Final preparation and submission of interim report to BLM.
*Spring/Summer 2018*: Second season of fieldwork to inventory complete inventory work as laid out in this proposal.
*Fall 2018:* Preparation and curation of collected specimens at the MWC.
*Winter 2018:* Final preparation and submission of final report to BLM

## 2.  PROPOSED WORK

A.  The Recipient's Project Proposal entitled A Critical Evaluation of the Paleontological Resources of the Triassic/Jurassic Transition for Purposes of Protection, Inventory, and Salvage Within the Bears Earns National Monument, is accepted by the BLM and made a part of this agreement in order to serve as the agreement's work plan. Other documents incorporated by reference include the recipient's Standard Form (SF) 424 Application for Federal Assistance, dated 02/02/2017, SF424A, Budget Information - Non-Construction Programs, SF424B, Assurances - Non-Construction Programs, Budget Detail, and signed Certification Regarding Lobbying - Certification for Contracts, Grants, Loans and Cooperative Agreements.

**BLM Agreement No.  L17AC00057**
Recipient Name: Museums of Western Colorado
Project Title: BLM Utah Survey of Paleontological Resources of the Bears Ears National Monument

**Attachment No. 1**
(Pg.  PAGE 10 of 23)

B.  In addition, the BLM will:

Make site visits as warranted by program needs.

**BLM Agreement No.  L17AC00057**                                      **Attachment No. 1**
Recipient Name: Museums of Western Colorado                           (Pg.  PAGE 10 of 23)
Project Title: BLM Utah Survey of Paleontological Resources of the Bears Ears National Monument

C.  In addition, the recipient will also be responsible for significant developments, i.e., events which may occur between the scheduled performance reporting dates that have significant impact upon the supported activity. In such cases, the recipient must inform the BLM or pass- through entity as soon as the following types of conditions become known:

1.  Problems, delays, or adverse conditions which will materially impair the ability to meet the objective of the Federal award. This disclosure must include a statement of the action taken, or contemplated, and any assistance needed to resolve the situation.

2.  Favorable developments which enable meeting time schedules and objectives sooner or at less cost than anticipated or producing more or different beneficial results than originally planned.

## 3.  TERM OF AGREEMENT

A.  The term, or period of performance, of this agreement shall become effective as of the date shown on the signed award cover page and may remain in effect for a maximum of five (5) years. The BLM will consider continued support of the project upon; (a) the recipient showing progress satisfactory to the BLM toward program goals and the determination by the BLM that continuation of the program would be in the best interests of the Government, and/or (b) the availability of funds.

B.  Budget and Program Revisions

1.  Recipients must submit in writing to the BLM's Program Officer (PO) any request for budget or program revision in accordance with 2 CFR 200.308.

2.  All modifications to the agreement shall be in writing and signed by the GMO. No oral statements or any written statements made by any person other than the GMO, shall in any manner modify or otherwise affect the terms of the agreement.

C.  Termination. This agreement may be terminated in accordance with the provisions of 2 CFR, Subpart D, Section 200.339 Termination.

## 4.  FINANCIAL SUPPORT AND PAYMENT METHOD

A.  Funding. This agreement may be funded each fiscal year (FY) based on the availability of BLM funding. Funds obligated but not expended by the recipient in a FY may be carried forward and expended in subsequent years.

B.  Maximum Obligations. The total obligations, including modifications, represent the amount for which the BLM will be responsible under the terms of this agreement. The BLM shall not be responsible to pay for, nor shall the

**BLM Agreement No.  L17AC00057**
Recipient Name: Museums of Western Colorado
Project Title: BLM Utah Survey of Paleontological Resources of the Bears Ears National Monument

**Attachment No. 1**
(Pg.  PAGE 10 of 23)

recipient be responsible to perform, any effort that will require the expenditure of Federal funds above the current obligated amount.

C.  Reimbursable Costs and Limitations. The recipient shall not incur costs or obligate funds for any purpose pertaining to operation of the program or activities beyond the expiration date stated in the agreement. The only costs which are authorized for a period of up to 90 days

**BLM Agreement No. L17AC00057**
Recipient Name: Museums of Western Colorado
Project Title: BLM Utah Survey of Paleontological Resources of the Bears Ears National Monument

**Attachment No. 1**
(Pg. PAGE 10 of 23)

following the award expiration date are those strictly associated with closeout activities for preparation of the final report. The BLM's financial participation is limited. The BLM will only fund up to its share of those amounts requested in the project proposal and as are subsequently approved and funded in the agreement. The recipient shall not be obligated to continue performance under the agreement or to incur costs in excess of the costs set forth in the proposal and subsequent agreement. However, if the Recipient chooses to expend funds in excess of the approved project budget, the Recipient will be responsible to fund the excess without funding participation by the Bureau.

    D.  Cost Sharing and Matching

Cost sharing for this agreement shall be in accordance with 2 CFR, Subpart D, Section 200.306, Cost sharing or matching.

    1.  There is no cost share or match legislatively required for this award.

    E.  Program Income

Program income generated under this award shall be in accordance with 2 CFR, Subpart D, Section 200.307(e)(1) Deduction - Program income must be deducted from total allowable costs to determine the net allowable costs, and be used for current costs unless the Federal awarding agency authorizes otherwise. Program income that the non-Federal entity did not anticipate at the time of the Federal award must be used to reduce the Federal award and non- Federal entity contributions rather than to increase the funds committed to the project. Program income generated through the performance of this project must be reported on Standard Form (SF) 425, Federal Financial Report (see section 6. PERFORMANCE, FINANCIAL, AND OTHER REPORTING).

    F.  Indirect Costs

    1.  The Recipient has never had a federally approved negotiated indirect rate, and as the BLM is the cognizant agency, the Recipient has requested and received approval from the BLM for reimbursement under this agreement at the de minimis rate shown on the award cover sheet under "Indirect Cost Rate." This rate is to be applied to the agreement's base modified total direct costs (MTDC). MTDC consist of all salaries and wages, fringe benefits, materials and supplies, services, travel, and subgrants and subcontracts up to the first $25,000 of each subgrant or subcontract (regardless of the period covered by the subgrant or subcontract). Equipment, capital expenditures, charges for patient care, rental costs and the portion of subgrants or subcontracts in excess of $25,000 shall be excluded from TDC. Participant support costs shall generally be excluded from MTDC.

    G.  Payment by Reimbursement

    1.  Payment will be made by draw-down reimbursement through the Department of the Treasury, Automated Standard Application for Payment (ASAP) System. See following website: http://www.fms.treas.gov/asap Treasury Circular 1075 (31 CFR 205) requires that draw-downs to a recipient organization

**BLM Agreement No.  L17AC00057**
Recipient Name: Museums of Western Colorado
Project Title: BLM Utah Survey of Paleontological Resources of the Bears Ears National Monument

**Attachment No. 1**
(Pg.  PAGE 10 of 23)

shall be limited to the minimum amounts needed and shall be timed to be in accordance with the actual, immediate cash requirements of the recipient organization in carrying out the purposes of the approved program or project. The timing and

**BLM Agreement No.  L17AC00057**                                        **Attachment No. 1**
Recipient Name: Museums of Western Colorado                                    (Pg.  PAGE 10 of 23)
Project Title: BLM Utah Survey of Paleontological Resources of the Bears Ears National Monument

amount of cash advances shall be as close as is administratively feasible to the actual disbursements by the recipient organization for direct program or project costs and the proportionate share of any allowable indirect costs

      2.  Funds that are available from repayments to and interest earned on a revolving fund, program income, rebates, refunds, contract settlements, audit recoveries, credits, discounts, and interest earned on any of those funds, must be disbursed before requesting additional cash payments.

     H.  Payment Review

If a recipient has a history of poor performance, financial instability, uses a management system not meeting standards prescribed by the Uniform Administrative Requirements, has not conformed to the terms and conditions of the award, and/or is not otherwise responsible in safeguarding Federal funds, they may be determined to be "high risk" and be placed on Agency Review. Agency Review limits a recipient's access to funds by requiring that all draw-down requests reviewed and approved prior to their being released. Recipients on agency review must submit a completed Standard Form (SF) 270 Request for Advance Payment or Reimbursement for each payment requested along with a detailed explanation of how the costs correspond to the approved budget categories as listed on their Application for Federal Assistance SF-424A Budget Information and their Detailed Budget Breakdown or Challenge Cost Share Program Commitment Document, whichever is applicable. Being put on Agency Review does not relieve the recipient of required financial or performance reporting requirements.

     I.  System for Award Management (SAM, [www.SAM.gov](www.SAM.gov))

Recipients of Federal financial assistance must maintain current registration with the System for Award Management (SAM, [www.SAM.gov](www.SAM.gov)). Failure to maintain registration can impact access to funds and future obligations under this agreement and any other financial assistance or procurement award the recipient may have with the Federal government.

## 5.  PERFORMANCE & FINANCIAL MONITORING

     A.  In accordance with 2 CFR 200.327 Financial Reporting and 200.328 Monitoring and Reporting Program Performance, the recipient is responsible for oversight, monitoring, and reporting of its activities under Federal awards to assure compliance with applicable Federal requirements and that performance expectations are being achieved. The BLM's monitoring of the recipient's activities may include review of the award file including discussions with the recipient regarding reporting, award activities, and project status (desk reviews), analysis of financial and performance reports, and discussions of specific issues related to project implementation, observation of project activity, and review of planned versus actual progress (site visits). The BLM has the right to inspect and evaluate the work performed or being performed under this agreement, and the premises where the work is being performed, at all reasonable times and in a manner that will not unduly delay the work. If the BLM performs inspection or evaluation on the premises of the recipient or a sub-recipient, the recipient shall

**BLM Agreement No.  L17AC00057**
Recipient Name: Museums of Western Colorado
Project Title: BLM Utah Survey of Paleontological Resources of the Bears Ears National Monument

**Attachment No. 1**
(Pg.  PAGE 10 of 23)

furnish and shall require sub-recipients to furnish all reasonable facilities and assistance for the safe and convenient performance of these duties.

BLM Agreement No.  L17AC00057                                          **Attachment No. 1**
Recipient Name: Museums of Western Colorado                                          (Pg. PAGE 10 of 23)
Project Title: BLM Utah Survey of Paleontological Resources of the Bears Ears National Monument

1. BLM programmatic monitoring addresses the content and substance of the program. It is a qualitative review to determine performance, innovation, and contributions to the field. The BLM may make site visits as warranted by program needs. In addition, the BLM has the right of timely and unrestricted access to any books, documents, papers, or other records of the recipient's that are pertinent to the award, in order to make audits, examinations, excerpts, transcripts, and copies of such documents. This right also includes timely and reasonable access to recipient personnel for the purpose of interviews and discussions related to such documents.

2. BLM financial monitoring ensures compliance with financial guidelines and general accounting practices. On-site or internal financial reviews are conducted to determine if: (1) award recipients are properly accounting for the receipt and expenditures of federal funds; (2) expenditures are in compliance with federal requirements and award special conditions; and (3) proper documentation on financial monitoring activities is prepared, maintained, and distributed as appropriate.

## 6.  PERFORMANCE, FINANCIAL, AND OTHER REPORTING

Periodic financial, performance, and (if applicable) youth employment status reporting is a condition of this financial assistance award. Submission of reports is required whether or not any work has been attempted and/or any funds have been drawn down or expended. Failure to comply with the reporting requirements included in this agreement may be considered a material non-compliance with the terms and conditions of the award. Non-compliance may result in withholding of future payments, suspension or termination of the agreement, recovery of funds paid under the agreement, and withholding of future awards. The periodic status reporting required under this agreement is as follows.

A.  Quarterly Federal Financial Reports

1. Recipients of Federal financial assistance are required to submit periodic financial reports which document the financial status of their awards. The Federal Financial Report (FFR) or Standard Form (SF) 425 and SF425A - Attachment, is the Office of Management and Budget (OMB) standard form used to report financial status. Expenditures and/or income may be reported either on a cash or accrual basis, whichever method is normally used by the recipient. Submitted SF425 reports must be signed by an authorized official of the recipient certifying that the information complete, accurate, consistent with the recipient's accounting system, and that all expenditures and obligations are for the purposes set forth in the agreement. The SF425 represents a claim to the Federal government, filing a false claim may result in civil or criminal penalties. Blank SF425 forms with instructions are available on the Grants.gov web site, URL: http://www.grants.gov/web/grants/forms.html.

2. Quarterly Reporting. Financial status reports under this agreement must be submitted on a quarterly (every three Months) basis. Reporting periods and report due dates under this agreement shall be as follows:

**BLM Agreement No.  L17AC00057**
Recipient Name: Museums of Western Colorado
Project Title: BLM Utah Survey of Paleontological Resources of the Bears Ears National Monument

**Attachment No. 1**
(Pg.  PAGE 10 of 23)

| _**Reporting Period Dates**_ | _**Submit Report By**_ |
|---|---|
| Award Start Date _through_ September 30, 2016* | October 31, 2016* |
| October 1, 2016 _through_ December 31, 2016* | January 31, 2017* |
| January 1, 2017 _through_ March 31, 2017* | April 30, 2017* |

**BLM Agreement No.  L17AC00057**
Recipient Name: Museums of Western Colorado
Project Title: BLM Utah Survey of Paleontological Resources of the Bears Ears National Monument

**Attachment No. 1**
(Pg. PAGE 10 of 23)

April 1, 2016 *through* June 30, 2017*                                        July 31, 2017*

*And each 3-Month period thereafter for the life of the agreement.

    3.   Quarterly financial reports are due by 30 Calendar days after the end of the reporting period. E-mail financial status reports to the BLM Staff and/or E-mail addresses listed on the Award Coversheet under, "E-mail Reports To:"

    4.   At the end of the agreement, final SF425 financial reports are due by 90 Calendar days after the expiration, termination, and/or project completion, whichever comes first. E-mail final financial status reports to the BLM Staff and/or E-mail addresses listed on the Award Coversheet under, "E-mail Reports To:"

   B.   Annual Performance Reports

    1.   Recipients of Federal financial assistance are required to submit periodic performance reports prepared in accordance with 2 CFR, Subpart D, Section 200.328 Monitoring and Reporting Program Performance. There is no standard form, however performance reports should always relate to the performance goals and objectives identified in Section 1. of this agreement. Performance reports must be submitted in a narrative summary to include, but not limited to, the following:

    a.   Completed established goals, work in progress, future work, the percentage of work completed (based on Section 1 and 2 of this document).

    b.   The reasons why established goals and objectives were not met or problems which may impact the ability to complete work on time with recommendations on their resolution, if appropriate.

    c.   Prediction of future activities and how they will be accomplished.

    d.   Where the accomplishments of the Federal award can be quantified, a computation of the cost (for example, related to units of accomplishment) may be required if that information will be useful.

    e.   Where performance trend data and analysis would be informative to the BLM program the Federal awarding agency should include this as a performance reporting requirement.

    f.   Additional pertinent information including, when appropriate, analysis and explanation of cost overruns or high unit costs.

    2.   Annual Reporting. Performance status reports under this agreement must be submitted on an annual basis. Reporting periods and report due dates under this agreement shall be as follows:

***Reporting Period Dates***                                        ***Submit Reports By***

**BLM Agreement No.  L17AC00057**
Recipient Name: Museums of Western Colorado
Project Title: BLM Utah Survey of Paleontological Resources of the Bears Ears National Monument

**Attachment No. 1**
(Pg.  PAGE 10 of 23)

Award Start Date *through* June 30, 2017*                    September 30, 2017*

*And each 12 Months thereafter for the life of the agreement.

   3.   Annual performance reports are due by 90 Calendar days after the end of the reporting period. E-mail performance reports to the BLM Staff and/or E-mail addresses listed on the Award Coversheet under, "E-mail Reports To:"

   4.   At the end of the agreement, final performance reports are due by 90 Calendar days after the expiration, termination, and/or project completion, whichever comes first. E-mail final performance reports to the BLM Staff and/or E-mail addresses listed on the Award Coversheet under, "E-mail Reports To:"

## 7.  LIABILITY, INSURANCE, AND INDEMNIFICATION

   A.  Liability. The BLM assumes no liability for any actions or activities conducted under this agreement except to the extent that recourse or remedies are provided by Congress under the Federal Tort Claims Act, 28 USC 2671.

   B.  Indemnification. The recipient hereby agrees:

   1.   To indemnify the federal government, Bureau of Land Management (BLM), from any act or omission of the recipient, its officers, employees, or (members, participants, agents, representatives, agents as appropriate) (1) against third party claims for damages arising from one or more activities carried out in connection with this financial assistance agreement and (2) for damage or loss to government property resulting from such an activity, to the extent the laws of the State where the recipient is located permit. This obligation shall survive the termination of this agreement.

   2.   To pay the United States the full value for all damage to the lands or other property of the United States caused by the recipient, its officers, employees, or (members, participants, agents, representatives, agents as appropriate).

   3.   To provide workers' compensation protection to the recipient's officers, employees, and representatives.

   4.   To cooperate with the BLM in the investigation and defense of any claims that may be filed with the BLM arising out of the activities of the recipient, its agents, and employees.

   5.   In the event of damage to or destruction of the buildings and facilities assigned for the use of the recipient in whole or in part by any cause whatsoever, nothing herein contained shall be deemed to require the BLM to replace or repair the buildings or facilities. If the BLM determines in writing, after consultation with the recipient that damage to the buildings or portions thereof renders such buildings unsuitable for continued use by the recipient, the BLM shall assume sole control over such buildings or portions thereof. If the buildings or facilities rendered

**BLM Agreement No.  L17AC00057**
Recipient Name: Museums of Western Colorado
Project Title: BLM Utah Survey of Paleontological Resources of the Bears Ears National Monument

**Attachment No. 1**
(Pg.  PAGE 10 of 23)

unsuitable for use are essential for conducting operations authorized under this agreement, then failure to substitute and assign other facilities acceptable to the recipient will constitute termination of this agreement by the BLM.

BLM Agreement No.  L17AC00057
Recipient Name: Museums of Western Colorado
Project Title: BLM Utah Survey of Paleontological Resources of the Bears Ears National Monument

Attachment No. 1
(Pg.  PAGE 10 of 23)

C.  Flow-down. For the purposes of this clause, "recipient" includes such subrecipients, contractors, or subcontractors as, in the judgment of the recipient and subject to the Government's determination of sufficiency, have sufficient resources and/or maintain adequate and appropriate insurance to achieve the purposes of this clause.

D.  Identified Activities. All activities carried out in connection with this financial assistance agreement.

## 8.  BLM PROPERTY STANDARDS

A.  Government-furnished property (GFP), such as tools and equipment, furnished by the BLM to the recipient shall be used for official purposes only and shall be subject to the terms of the agreement. Tools and equipment shall be returned in the same condition received except for normal wear and tear in project use. Any BLM property used or other property acquired under this agreement, including intangible property such as copyrights and patents, shall be governed by the property management provisions of 2 CFR, Subpart D, Sections 200.310 to 200.316, Property Standards.

B.  Intangible Property.

1. Title to intangible property (see § 200.59 Intangible property) acquired under a Federal award vests upon acquisition in the non-Federal entity. The non-Federal entity must use that property for the originally-authorized purpose, and must not encumber the property without approval of the Federal awarding agency. When no longer needed for the originally authorized purpose, disposition of the intangible property must occur in accordance with the provisions in § 200.313 Equipment paragraph (e).

2. The non-Federal entity may copyright any work that is subject to copyright and was developed, or for which ownership was acquired, under a Federal award. The Federal awarding agency reserves a royalty-free, nonexclusive and irrevocable right to reproduce, publish, or otherwise use the work for Federal purposes, and to authorize others to do so.

3. The non-Federal entity is subject to applicable regulations governing patents and inventions, including Governmentwide regulations issued by the Department of Commerce at 37 CFR Part 401, "Rights to Inventions Made by Nonprofit Organizations and Small Business Firms Under Government Awards, Contracts and Cooperative Agreements."

4. The Federal government has the right to: (a) Obtain, reproduce, publish, or otherwise use the data produced under a Federal award; and (b) Authorize others to receive, reproduce, publish, or otherwise use such data for Federal purposes.

**BLM Agreement No.  L17AC00057**
Recipient Name: Museums of Western Colorado
Project Title: BLM Utah Survey of Paleontological Resources of the Bears Ears National Monument

**Attachment No. 1**
(Pg.  PAGE 10 of 23)

C.  Recipient staff will be required to complete a BLM-approved Defensive Driving Course if driving a Government-owned vehicle (GOV).

D.  Recipient staff will be required to complete a BLM-approved Four-wheel ATV safety and training program if using Government-furnished ATVs.

BLM Agreement No.  L17AC00057
Recipient Name: Museums of Western Colorado
Project Title: BLM Utah Survey of Paleontological Resources of the Bears Ears National Monument

Attachment No. 1
(Pg. PAGE 10 of 23)

E.  Recipient staff will be required to complete a BLM-approved safety and training program if using Government-furnished power equipment, such as chainsaws, wood chippers, etc. The recipient will be responsible for meeting all protective equipment requirements if using Government-furnished equipment.

## 9.  KEY OFFICIALS

The key officials on this agreement are listed on the award cover page(s) and are considered to be essential to ensure maximum coordination and communication between the parties and the work being performed. Upon written notice, either party may designate an alternate to act in the place of their designated key official.

## 10. GENERAL TERMS AND CONDITIONS

The U.S. Department of the Interior agencies, including the Bureau of Land Management implemented the new regulations on December 26, 2014 in the 2 CFR, Part 200—UNIFORM ADMINISTRATIVE REQUIREMENTS, COST PRINCIPLES, AND AUDIT REQUIREMENTS FOR FEDERAL AWARDS

A.  Administrative and National Policy Requirements

1.  By accepting Federal funding, your organization agrees to abide by the new Uniform Guidance for Grants in the expenditure of Federal funds and performance under this financial assistance award, which was implemented by Office of Management and Budget (OMB). Final Guidance has been issued and has superseded requirements from OMB Circulars, which have been replaced by the 2 Code of Federal Regulations (CFR) Grants and Agreements, Part 200.

2 CFR, Part 200 is available at the following website: http://www.ecfr.gov/cgi-bin/text-idx?c=ecfr&tpl=/ecfrbrowse/Title02/2cfr200_main_02.tpl

B.  Administrative Requirements

1.  2 CFR Part 200 Subparts A through E - UNIFORM ADMINISTRATIVE REQUIREMENTS, AND COST PRINCIPLES.

2.  2 CFR, Subpart B, 200.112 - CONFLICT OF INTEREST – *Refer to Section 13, item 1. of this document for full text term and condition.*

3.  2 CFR, Subpart B, 200.317 – 316 - Procurement Standards.

a. §200.326 Contract Provisions: The non-Federal entity's contracts must contain the applicable provisions described in Appendix II to Part, 200 – Contract Provisions for non- Federal Entity Contracts Under Federal Awards. *Refer to Section 13, item 2. of this document for full text term and condition.*

4.  2 CFR, Subpart C, Part 200.412 - 419 – Direct and Indirect (F & A) Cost

a.  2 CFR, Appendix III to Part 200 - Indirect (F&A) Costs Identification and Assignment, and Rate Determination for Institutions of Higher Education (IHEs)

b.  Appendix IV to Part 200 - Indirect (F&A) Costs Identification and Assignment, and Rate Determination for Nonprofit Organizations

**BLM Agreement No.  L17AC00057**
Recipient Name: Museums of Western Colorado
Project Title: BLM Utah Survey of Paleontological Resources of the Bears Ears National Monument

**Attachment No. 1**
(Pg.  PAGE 10 of 23)

    c.  Appendix V to Part 200 - State/Local Government-wide Central Service Cost Allocation Plans

5.   2 CFR Part 200 Subpart F - AUDIT REQUIREMENTS. Non-Federal entities that expend $750,000.00, or more, in federal awards in a single year shall have a single or program-specific audit conducted for that year in accordance with the Single Audit Act Amendments of 1996 (31 U.S.C. 7501-7507) and revised OMB Circular A-133, available at: http://www.whitehouse.gov/omb/circulars_default.

a.   This and any other federal financial assistance award should be reported under its appropriate Catalog of Federal Domestic Assistance (CFDA) number, refer to header for appropriate CFDA to report.

6.   Appendix XII to Part 200—Award Term and Condition for Recipient Integrity and Performance Matters. (Refer to Section 13. 3. below for full text.)

C.   Program Legislation and/or Regulations:

1.   Scientific integrity is vital to Department of the Interior (DOI) activities under which scientific research, data, summaries, syntheses, interpretations, presentations, and/or publications are developed and used. Failure to uphold the highest degree of scientific integrity will result not only in potentially flawed scientific results, interpretations, and applications but will damage DOI's reputation and ability to uphold the public's trust. All work performed must comply with the DOI Scientific Integrity Policy posted to http://www.doi.gov, or its equivalent as provided by their organization or State law. For more information go to URL: https://www.doi.gov/scientificintegrity.

D.   Standard Award Terms and Conditions

1.   Code of Federal Regulations/Regulatory Requirements, as applicable:

a.   2 CFR Part 25, *Universal Identifier and System of Award Management*

b.   2 CFR Part 170, Appendix A Award Term - *Reporting Subawards and Executive Compensation*

c.   2 CFR Part 175, *Award Term for Trafficking in Persons*

d.   2 CFR Part 180 & 2 CFR Part 1400, *Government-wide Debarment and Suspension (Non-procurement)*

e.   2 CFR Part 182 & 2 CFR Part 1401, *Requirements for Drug-Free Workplace (Financial Assistance)*

f.   43 CFR 18, *New Restrictions on Lobbying*: Submission of an application also represents the applicant's certification of the statements in 43 CFR Part 18, Appendix A, *Certification Regarding Lobbying*.

g.   41 USC §4712, *Enhancement of Recipient and Sub-recipient Employee Whistleblower Protection.*

(a) This award and related subawards and contracts over the simplified acquisition threshold and all employees working on this award and related subawards and contracts over the simplified acquisition threshold are subject to the whistleblower rights and remedies in the pilot program on award recipient employee whistleblower protections established at 41 U.S.C. 4712 by section 828 of the *National Defense Authorization Act for Fiscal Year 2013* (P.L.

BLM Agreement No.  L17AC00057
Recipient Name: Museums of Western Colorado
Project Title: BLM Utah Survey of Paleontological Resources of the Bears Ears National Monument

Attachment No. 1
(Pg.  PAGE 10 of 23)

112-239).

     (b) Recipients, and their subrecipients and contractors awarded contracts over the simplified acquisition threshold related to this award, shall inform their employees in writing,

BLM Agreement No. L17AC00057

Recipient Name: Museums of Western Colorado
Project Title: BLM Utah Survey of Paleontological Resources of the Bears Ears National Monument

Attachment No. 1
(Pg. PAGE 10 of 23)

in the predominant language of the workforce, of the employee whistleblower rights and protections under 41 U.S.C. 4712.

(c) The award recipient shall insert the substance of this clause, including this paragraph (c), in all subawards or subcontracts over the simplified acquisition threshold, 42 CFR §52.203-17 (as referenced in 42 CFR §3.908-9).

h.  41 USC §6306, *Prohibition on Members of Congress Making Contracts with Federal Government*: No member of or delegate to the United States Congress or Resident Commissioner shall be admitted to any share or part of this award, or to any benefit that may arise therefrom; this provision shall not be construed to extend to an award made to a corporation for the public's general benefit.

i.  Executive Order 13513, *Federal Leadership on Reducing Text Messaging while Driving*: Recipients are encouraged to adopt and enforce policies that ban text messaging while driving, including conducting initiatives of the type described in section 3(a) of the order.

j.  Executive Order 13043 , *Increase Seat Belt Use in the United States* Recipients of grants/cooperative agreements and/or sub-awards are encouraged to adopt and enforce on-the-job seat belt use policies and programs for their employees when operating company-owned, rented, or personally owned vehicles. These measures include, but are not limited to, conducting education, awareness, and other appropriate programs for their employees about the importance of wearing seat belts and the consequences of not wearing them.

k.  Executive Order 13658, Minimum Wage for Contractors, seeks to increase the efficiency and cost savings in the work performed by parties who contract with the Federal Government by increasing the hourly minimum wage paid by those contractors and any subcontractors. (see 79 CFR 9851). Refer to Section 13, item 4. of this document for full text term and condition.

l.  Opposition to Any Legislation. In accordance with the Department of the Interior, Environment, and Related Agencies Act, 2006, Title IV, Section 402, no part of any appropriation contained in this Act shall be available for any activity or the publication or distribution of literature that in any way tends to promote public support or opposition to any legislative proposal on which Congressional action is not complete other than to communicate to Members of Congress as described in 18 U.S.C. 1913.

m.  Endorsements.

(1) Recipient shall not publicize or otherwise circulate, promotional material (such as advertisements, sales brochures, press releases, speeches, still and motion pictures, articles, manuscripts or other publications) which states or implies governmental, Departmental, bureau, or government employee endorsement of a product, service, or position which the recipient represents. No release of information relating to this award may state or imply that the Government approves of the recipient's work products, or considers the recipient's work product to be superior to other products or services.

**BLM Agreement No.  L17AC00057**
Recipient Name: Museums of Western Colorado
Project Title: BLM Utah Survey of Paleontological Resources of the Bears Ears National Monument

**Attachment No. 1**
(Pg.  PAGE 10 of 23)

(2) All information submitted for publication or other public releases of information regarding this project shall carry the following disclaimer:

***The views and conclusions contained in this document are those of the authors and should not be interpreted as representing the opinions or policies of the U.S. Government. Mention of trade names or commercial products does not constitute their endorsement by the U.S. Government.***

(3) Recipient must obtain prior Government approval for any public information releases concerning this award which refer to the Department of the Interior or any bureau or employee (by name or title). The specific text, layout photographs, etc. of the proposed release must be submitted with the request for approval.

(4) A recipient further agrees to include this provision in a subaward to and subrecipient, except for a subaward to a State government, a local government, or to a federally recognized Indian tribal government.

n.   Publications of Results of Studies. No party will unilaterally publish a joint publication without consulting the other party. This restriction does not apply to popular publications of previously published technical matter. Publications pursuant to this Agreement may be produced independently or in collaboration with others; however, in all cases proper credit will be given to the efforts of those parties contribution to the publication. In the event no agreement is reached concerning the manner of publication or interpretation of results, either party may publish data after due notice and submission of the proposed manuscripts to the other. In such instances, the party publishing the data will give due credit to the cooperation but assume full responsibility for any statements on which there is a difference of opinion.

o.   Retention and Access Requirements for Records.

(1) All recipient financial and programmatic records, supporting documents, statistical records, and other grants-related records shall be maintained and available for access in accordance with 2 CFR, Subpart D, Sections 200.333 through 200.337, Record Retention and Access.

(2) Inspector General's (IG's) Office Access to Records - Recipients shall provide additional access for the IG's office to examine recipient's records and to interview officers/employees of recipient.

p.   Prohibition on Issuing Financial Assistance Awards to Entities that Require Certain Internal Confidentiality Agreements.

Section 743 of Division E, Title VII of the Consolidated and Further Continuing Resolution Appropriations Act of 2015 (Pub. L. 113-235) prohibits the use of funds appropriated or otherwise made available under that or any other Act for grants or cooperative agreements to an entity that requires employees or contractors of such entity seeking to report fraud, waste, or abuse to sign internal confidentiality agreements or statements prohibiting or otherwise restricting such employees or contractors from lawfully reporting such waste, fraud, or abuse to a designated investigative or law enforcement representative of a federal department or agency authorized to receive such information.

Recipients must not require their employees or contractors seeking to report fraud, waste, or abuse to sign internal confidentiality agreements or statements prohibiting or otherwise restricting such employees or contractors from lawfully reporting such waste, fraud, or abuse to a designated investigative or law enforcement representative of a federal department or agency authorized to receive such information.

Recipients must notify their employees or contractors that existing internal confidentiality agreements covered by this condition are no longer in effect.

**BLM Agreement No.  L17AC00057**
Recipient Name: Museums of Western Colorado
Project Title: BLM Utah Survey of Paleontological Resources of the Bears Ears National Monument

**Attachment No. 1**
(Pg.  PAGE 10 of 23)

2.   Order of Precedence. Any inconsistency in this agreement shall be resolved by giving precedence in the following order: (a) Any national policy requirements and administrative management standards; (b) 2 CFR. Part 200; (c) requirements of the applicable

BLM Agreement No.  L17AC00057
Recipient Name: Museums of Western Colorado
Project Title: BLM Utah Survey of Paleontological Resources of the Bears Ears National Monument

Attachment No. 1
(Pg. PAGE 10 of 23)

OMB Circulars and Treasury regulations; (d) special terms and conditions; (e) all agreement sections, documents, exhibits, and attachments; and (f) the recipient's project proposal.

## 11. SPECIAL TERMS AND CONDITIONS

A.  Deposit of Publications. In addition to any requirements listed in the Project Management Plan, two (2) copies of each applicable publication produced under this agreement shall be sent to the Natural Resources Library with a transmittal that identifies the sender and the publication, and states that the publication is intended for deposit in the Natural Resources Library. Publications shall be sent to the following address:

U.S. Department of the Interior Natural Resources Library Interior Service Center Gifts and Exchanges Section 1849 C Street, N.W. Washington, D.C. 20240

## 12. DEFINITIONS & ACRONYMS

Agency Review: If a recipient has a history of poor performance, financial instability, has a management system not meeting standards prescribed by the Uniform Administrative Requirements, has not conformed to the terms and conditions of the award, and/or is not otherwise responsible in safeguarding federal funds, they may be placed on Agency Review. Agency Review limits a recipient's access to funds by requiring that all payments must be requested, reviewed, and approved prior to their being released.

Award Recipient: The Award Recipient is the recipient's individual who is authorized to act for the applicant and to assume the obligations imposed by the Federal laws, regulations, requirements, and conditions that apply to grant applications or grant awards.

BLM: Bureau of Land Management may, also be referred to as Bureau. CFR:

Code of Federal Regulations.

DOI: Department of the Interior.

FFR: Federal Financial Report or Standard Form (SF) 425.

Financial Assistance Agreement: This grant or cooperative agreement. The term grant is defined as all Federal financial assistance that provides support or stimulation to accomplish a public purpose. Use of the term "grant" includes grants and/or cooperative agreements awarded by the Federal Government to eligible recipients.

FY: Federal Fiscal Year which runs from October 1 through September 30 each year.

GMO: Grants Management Officer, the only individual in the BLM who is authorized to obligate funds, award, modify, and/or terminate assistance agreements.

GMS: Grants Management Specialist, the administrative individual authorized to prepare assistance agreement awards and modifications, but who cannot obligate funds, award, modify, and/or terminate the agreement.

NTE: Not-to-exceed amount, the maximum Federal funding amount available for

**BLM Agreement No.  L17AC00057**
Recipient Name: Museums of Western Colorado
Project Title: BLM Utah Survey of Paleontological Resources of the Bears Ears National Monument

**Attachment No. 1**
(Pg.  PAGE 10 of 23)

reimbursement to the recipient.

**BLM Agreement No. L17AC00057**                                                    **Attachment No. 1**
Recipient Name: Museums of Western Colorado                                          (Pg. PAGE 10 of 23)
Project Title: BLM Utah Survey of Paleontological Resources of the Bears Ears National Monument

OMB: The Office of Management and Budget. OMB leads development of government- wide policy to assure that grants are managed properly and that Federal dollars are spent in accordance with applicable laws and regulations. OMB Circulars that apply to this agreement may be found on the OMB Website, URL: http://www.whitehouse.gov/omb/circulars_default/.

PI: The BLM Project Inspector, the technical advisor assisting the BLM Program Officer in administering and monitoring the technical aspects of the agreement. The Project Inspector is not authorized to modify this agreement or obligate the Government in any way.

PO: The BLM Program Officer, appointed for the purposes of monitoring the technical aspects of the agreement. The PO will work closely with the RPM and is authorized to clarify technical requirements, and review and approve work which is clearly within the objectives specified in this agreement. The PO will review financial, performance, and youth employment reports, and review and recommend approval of payments to the GMO if a recipient is on Agency Review. The PO is not authorized to modify this agreement or obligate the Government in any way.

Recipient: The organization and/or individual named in Box 5. of the "Grant and Cooperative Agreement" cover sheet.

RPM: The recipient's Project or Program Manager, designated to direct the project or activity being supported by the agreement. The RPM is responsible and accountable to the recipient and BLM for the proper implementation of the project or activity.

## 13. FULL TEXT TERMS AND CONDITIONS

### 1. Department of Interior Conflict of Interest Term and Condition:

a. The Recipient must establish safeguards to prohibit its employees and Subrecipients from using their positions for purposes that constitute or present the appearance of a personal or organizational conflict of interest. The Recipient is responsible for notifying the Grants Officer in writing of any actual or potential conflicts of interest that may arise during the life of this award. Conflicts of interest include any relationship or matter which might place the Recipient or its employees in a position of conflict, real or apparent, between their responsibilities under the agreement and any other outside interests. Conflicts of interest may also include, but are not limited to, direct or indirect financial interests, close personal relationships, positions of trust in outside organizations, consideration of future employment arrangements with a different organization, or decision-making affecting the award that would cause a reasonable person with knowledge of the relevant facts to question the impartiality of the Recipient and/or Recipient's employees and Sub-recipients in the matter.

b. The Grants Officer and the servicing Ethics Counselor will determine if a conflict of interest exists. If a conflict of interest exists, the Grants Officer will determine whether a mitigation plan is feasible. Mitigation plans must be approved by the Grants Officer in writing. Failure to resolve conflicts of interest in a manner that satisfies the government may be cause for termination of the award.

c. Failure to make required disclosures may result in any of the remedies described in 2 CFR § 200.338, Remedies for Noncompliance, including suspension

**BLM Agreement No.  L17AC00057**
Recipient Name: Museums of Western Colorado
Project Title: BLM Utah Survey of Paleontological Resources of the Bears Ears National Monument

**Attachment No. 1**
(Pg.  PAGE 10 of 23)

or debarment (see also 2 CFR Part 180).

    d.  Definitions:

BLM Agreement No.  L17AC00057
Recipient Name: Museums of Western Colorado
Project Title: BLM Utah Survey of Paleontological Resources of the Bears Ears National Monument

Attachment No. 1
(Pg. PAGE 10 of 23)

(1) Conflict of Interest is defined as any relationship or matter which might place the Recipient, its employees, and/or its Subrecipients in a position of conflict, real or apparent, between their responsibilities under the agreement and any other outside interests. Conflicts of interest may also include, but are not limited to, direct or indirect financial interests, close personal relationships, positions of trust in outside organizations, consideration of future employment arrangements with a different organization, or decision-making affecting the award that would cause a reasonable person with knowledge of the relevant facts to question the impartiality of the Recipient and/or Recipient's employees and Subrecipients in the matter.

(2) Close Personal Relationship means a Federal award program employee's childhood or other friend, sibling, or other family relations that may compromise or impair the fairness and impartiality of the Proposal Evaluator and Advisor and Grants Officer in the review, selection, award, and management of a financial assistance award.

(3) Discretionary Federal Financial Assistance means Federal awards including grants and agreements that are awarded at the discretion of the agency.

(4) Employment means:

(a) In any capacity, even if otherwise permissible, by any applicant or potential applicant for a Federal financial assistance award;

(b) Employment within the last 12 months with a different organization applying for some portion of the award's approved project activities and funding to complete them OR expected to apply for and to receive some portion of the award; and/or

(c) Employment with a different organization of any member of the organization employee's household or a relative with whom the organization's employee has a close personal relationship who is applying for some portion of the award's approved project activities and funding to complete them OR expected to apply for and to receive some portion of the award.

(d) Non-Federal entity means a State, local government, Indian tribe, institution of higher education, or nonprofit organization that carries out a Federal award as a Recipient or Subrecipient.

(e) Recipient means a non-Federal entity that receives a Federal award directly from a Federal awarding agency to carry out an activity under a Federal program. The term Recipient does not include Subrecipients.

(f) Subrecipient means a non-Federal entity that receives a subaward from a pass-through entity to carry out part of a Federal program, but does not include an individual who is a beneficiary of such program. A Subrecipient may also be a recipient of other Federal awards directly from a Federal awarding agency.

## 2. Appendix II to Part 200—Contract Provisions for Non-Federal Entity Contracts Under Federal Awards

**BLM Agreement No.  L17AC00057**
Recipient Name: Museums of Western Colorado
Project Title: BLM Utah Survey of Paleontological Resources of the Bears Ears National Monument

**Attachment No. 1**
(Pg.  PAGE 10 of 23)

In addition to other provisions required by the Federal agency or non-Federal entity, all contracts made by the non-Federal entity under the Federal award must contain provisions covering the following, as applicable.

(A)   Contracts for more than the simplified acquisition threshold currently set at $150,000, which is the inflation adjusted amount determined by the Civilian Agency Acquisition Council and the Defense Acquisition Regulations Council (Councils) as authorized by 41 U.S.C.

BLM Agreement No.  L17AC00057

Recipient Name: Museums of Western Colorado
Project Title: BLM Utah Survey of Paleontological Resources of the Bears Ears National Monument

Attachment No. 1
(Pg. PAGE 10 of 23)

1908, must address administrative, contractual, or legal remedies in instances where contractors violate or breach contract terms, and provide for such sanctions and penalties as appropriate.

(B)  All contracts in excess of $10,000 must address termination for cause and for convenience by the non-Federal entity including the manner by which it will be effected and the basis for settlement.

(C)  Equal Employment Opportunity. Except as otherwise provided under 41 CFR Part 60, all contracts that meet the definition of "federally assisted construction contract" in 41 CFR Part 60-1.3 must include the equal opportunity clause provided under 41 CFR 60-1.4(b), in accordance with Executive Order 11246, "Equal Employment Opportunity" (30 FR 12319, 12935, 3 CFR Part, 1964-1965 Comp., p. 339), as amended by Executive Order 11375, "Amending Executive Order 11246 Relating to Equal Employment Opportunity," and implementing regulations at 41 CFR part 60, "Office of Federal Contract Compliance Programs, Equal Employment Opportunity, Department of Labor."

(D)  Davis-Bacon Act, as amended (40 U.S.C. 3141-3148). When required by Federal program legislation, all prime construction contracts in excess of $2,000 awarded by non-Federal entities must include a provision for compliance with the Davis-Bacon Act (40 U.S.C. 3141- 3144, and 3146-3148) as supplemented by Department of Labor regulations (29 CFR Part 5, "Labor Standards Provisions Applicable to Contracts Covering Federally Financed and Assisted Construction"). In accordance with the statute, contractors must be required to pay wages to laborers and mechanics at a rate not less than the prevailing wages specified in a wage determination made by the Secretary of Labor. In addition, contractors must be required to pay wages not less than once a week. The non-Federal entity must place a copy of the current prevailing wage determination issued by the Department of Labor in each solicitation. The decision to award a contract or subcontract must be conditioned upon the acceptance of the wage determination. The non-Federal entity must report all suspected or reported violations to the Federal awarding agency. The contracts must also include a provision for compliance with the Copeland "Anti-Kickback" Act (40 U.S.C. 3145), as supplemented by Department of Labor regulations (29 CFR Part 3, "Contractors and Subcontractors on Public Building or Public Work Financed in Whole or in Part by Loans or Grants from the United States"). The Act provides that each contractor or subrecipient must be prohibited from inducing, by any means, any person employed in the construction, completion, or repair of public work, to give up any part of the compensation to which he or she is otherwise entitled. The non-Federal entity must report all suspected or reported violations to the Federal awarding agency.

(E)  Contract Work Hours and Safety Standards Act (40 U.S.C. 3701-3708). Where applicable, all contracts awarded by the non-Federal entity in excess of $100,000 that involve the employment of mechanics or laborers must include a provision for compliance with 40 U.S.C. 3702 and 3704, as supplemented by Department of Labor regulations (29 CFR Part 5). Under 40

U.S.C. 3702 of the Act, each contractor must be required to compute the wages of every mechanic and laborer on the basis of a standard work week of 40 hours. Work in excess of the standard work week is permissible provided that the worker is compensated at a rate of not

**BLM Agreement No.  L17AC00057**
Recipient Name: Museums of Western Colorado
Project Title: BLM Utah Survey of Paleontological Resources of the Bears Ears National Monument

**Attachment No. 1**
(Pg.  PAGE 10 of 23)

less than one and a half times the basic rate of pay for all hours worked in excess of 40 hours in the work week. The requirements of 40 U.S.C. 3704 are applicable to construction work and provide that no laborer or mechanic must be required to work in surroundings or under working conditions which are unsanitary, hazardous or dangerous. These requirements do not apply to the purchases of supplies or materials or articles ordinarily available on the open market, or contracts for transportation or transmission of intelligence.

(F)   Rights to Inventions Made Under a Contract or Agreement. If the Federal award meets the definition of "funding agreement" under 37 CFR §401.2 (a) and the recipient or subrecipient wishes to enter into a contract with a small business firm or nonprofit organization regarding the substitution of parties, assignment or performance of experimental, developmental, or research work under that "funding agreement," the recipient or subrecipient must comply with the requirements of 37 CFR Part 401, "Rights to Inventions Made by Nonprofit Organizations and Small Business Firms Under Government Grants, Contracts and Cooperative Agreements," and any implementing regulations issued by the awarding agency.

(G)   Clean Air Act (42 U.S.C. 7401-7671q.) and the Federal Water Pollution Control Act (33 U.S.C. 1251-1387), as amended—Contracts and subgrants of amounts in excess of

$150,000 must contain a provision that requires the non-Federal award to agree to comply with all applicable standards, orders or regulations issued pursuant to the Clean Air Act (42 U.S.C. 7401-7671q) and the Federal Water Pollution Control Act as amended (33 U.S.C. 1251-1387). Violations must be reported to the Federal awarding agency and the Regional Office of the Environmental Protection Agency (EPA).

(H)   Debarment and Suspension (Executive Orders 12549 and 12689)—A contract award (see 2 CFR 180.220) must not be made to parties listed on the Governmentwide exclusions in the System for Award Management (SAM), in accordance with the OMB guidelines at 2 CFR 180 that implement Executive Orders 12549 (3 CFR part 1986 Comp., p. 189) and 12689 (3 CFR part 1989 Comp., p. 235), "Debarment and Suspension." SAM Exclusions contains the names of parties debarred, suspended, or otherwise excluded by agencies, as well as parties declared ineligible under statutory or regulatory authority other than Executive Order 12549.

(I)   Byrd Anti-Lobbying Amendment (31 U.S.C. 1352)—Contractors that apply or bid for an award exceeding $100,000 must file the required certification. Each tier certifies to the tier above that it will not and has not used Federal appropriated funds to pay any person or organization for influencing or attempting to influence an officer or employee of any agency, a member of Congress, officer or employee of Congress, or an employee of a member of Congress in connection with obtaining any Federal contract, grant or any other award covered by 31

U.S.C. 1352. Each tier must also disclose any lobbying with non-Federal funds that takes place in connection with obtaining any Federal award. Such disclosures are forwarded from tier to tier up to the non-Federal award.

(J)   See §200.322 Procurement of recovered materials.

### 3.   Appendix XII to Part 200—Award Term and Condition for Recipient Integrity and Performance Matters

A. Reporting of Matters Related to Recipient Integrity and Performance

1.   General Reporting Requirement

If the total value of your currently active grants, cooperative agreements, and procurement contracts from all Federal awarding agencies exceeds $10,000,000 for any period of time during the period of performance of this Federal award, then you as the recipient during that period of time must maintain the currency of information reported to the System for Award

**BLM Agreement No.  L17AC00057**
Recipient Name: Museums of Western Colorado
Project Title: BLM Utah Survey of Paleontological Resources of the Bears Ears National Monument

**Attachment No. 1**
(Pg.  PAGE 10 of 23)

Management (SAM) that is made available in the designated integrity and performance system (currently the Federal Awardee Performance and Integrity Information System (FAPIIS)) about civil, criminal, or administrative proceedings described in paragraph 2 of this award term and condition. This is a statutory requirement under section 872 of Public Law 110-417, as amended

(41 U.S.C. 2313). As required by section 3010 of Public Law 111-212, all information posted in the designated integrity and performance system on or after April 15, 2011, except past performance reviews required for Federal procurement contracts, will be publicly available.

### 2.   Proceedings About Which You Must Report

Submit the information required about each proceeding that:

    a.   Is in connection with the award or performance of a grant, cooperative agreement, or procurement contract from the Federal Government;

    b.   Reached its final disposition during the most recent five year period; and

    c.   Is one of the following:

    (1) A criminal proceeding that resulted in a conviction, as defined in paragraph 5 of this award term and condition;

    (2) A civil proceeding that resulted in a finding of fault and liability and payment of a monetary fine, penalty, reimbursement, restitution, or damages of $5,000 or more;

    (3) An administrative proceeding, as defined in paragraph 5. of this award term and condition, that resulted in a finding of fault and liability and your payment of either a monetary fine or penalty of $5,000 or more or reimbursement, restitution, or damages in excess of $100,000; or

    (4) Any other criminal, civil, or administrative proceeding if:

    (i)   It could have led to an outcome described in paragraph 2.c.(1), (2), or (3) of this award term and condition;

    (ii)  It had a different disposition arrived at by consent or compromise with an acknowledgment of fault on your part; and

    (iii) The requirement in this award term and condition to disclose information about the proceeding does not conflict with applicable laws and regulations.

### 3.   Reporting Procedures

Enter in the SAM Entity Management area the information that SAM requires about each proceeding described in paragraph 2 of this award term and condition. You do not need to submit the information a second time under assistance awards that you received if you already provided the information through SAM because you were required to do so under Federal procurement contracts that you were awarded.

### 4.   Reporting Frequency

During any period of time when you are subject to the requirement in paragraph 1 of this award term and condition, you must report proceedings information through SAM for the most recent five year period, either to report new information about any proceeding(s) that you have not reported previously or affirm that there is no new information to report. Recipients that have Federal contract, grant, and cooperative agreement awards with a cumulative total value greater than $10,000,000 must disclose semiannually any information about the criminal, civil, and administrative proceedings.

**BLM Agreement No.  L17AC00057**
Recipient Name: Museums of Western Colorado
Project Title: BLM Utah Survey of Paleontological Resources of the Bears Ears National Monument

**Attachment No. 1**
(Pg.  PAGE 10 of 23)

5.   Definitions

For purposes of this award term and condition:

BLM Agreement No.  L17AC00057                                          **Attachment No. 1**
Recipient Name: Museums of Western Colorado                           (Pg. PAGE 10 of 23)
Project Title: BLM Utah Survey of Paleontological Resources of the Bears Ears National Monument

a.  Administrative proceeding means a non-judicial process that is adjudicatory in nature in order to make a determination of fault or liability (e.g., Securities and Exchange Commission Administrative proceedings, Civilian Board of Contract Appeals proceedings, and Armed Services Board of Contract Appeals proceedings). This includes proceedings at the Federal and State level but only in connection with performance of a Federal contract or grant. It does not include audits, site visits, corrective plans, or inspection of deliverables.

b.  Conviction, for purposes of this award term and condition, means a judgment or conviction of a criminal offense by any court of competent jurisdiction, whether entered upon a verdict or a plea, and includes a conviction entered upon a plea of nolo contendere.

c.  Total value of currently active grants, cooperative agreements, and procurement contracts includes—

(1) Only the Federal share of the funding under any Federal award with a recipient cost share or match; and

(2) The value of all expected funding increments under a Federal award and options, even if not yet exercised.

## 4.   MINIMUM WAGES UNDER EXECUTIVE ORDER 13658 (January 2015)

(a) Definitions. As used in this clause—

"United States" means the 50 states and the District of Columbia. "Worker"—

(1) Means any person engaged in performing work on, or in connection with, a contract covered by Executive Order 13658, and

(i)   Whose wages under such contract are governed by the Fair Labor Standards Act (29 U.S.C. chapter 8), the Service Contract Labor Standards statute (41 U.S.C. chapter 67), or the Wage Rate Requirements (Construction) statute (40 U.S.C. chapter 31, subchapter IV),

(ii)  Other than individuals employed in a bona fide executive, administrative, or professional capacity, as those terms are defined in 29 CFR part 541,

(iii) Regardless of the contractual relationship alleged to exist between the individual and the employer.

(2) Includes workers performing on, or in connection with, the contract whose wages are calculated pursuant to special certificates issued under 29 U.S.C. 214(c).

(3) Also includes any person working on, or in connection with, the contract and individually registered in a bona fide apprenticeship or training program registered with the Department of Labor's Employment and Training Administration, Office of Apprenticeship, or with a State Apprenticeship Agency recognized by the Office of Apprenticeship.

(b) Executive Order Minimum Wage rate.

(1) The Contractor shall pay to workers, while performing in the United States, and performing on, or in connection with, this contract, a minimum hourly

**BLM Agreement No.  L17AC00057**
Recipient Name: Museums of Western Colorado
Project Title: BLM Utah Survey of Paleontological Resources of the Bears Ears National Monument

**Attachment No. 1**
(Pg.  PAGE 10 of 23)

wage rate of $10.10 per hour beginning January 1, 2015.

      (2) The Contractor shall adjust the minimum wage paid, if necessary, beginning January 1, 2016 and annually thereafter, to meet the Secretary of Labor's annual E.O. minimum wage. The Administrator of the Department of Labor's Wage and Hour Division (the

BLM Agreement No.  L17AC00057                                      **Attachment No. 1**
Recipient Name: Museums of Western Colorado                       (Pg.  PAGE 10 of 23)
Project Title: BLM Utah Survey of Paleontological Resources of the Bears Ears National Monument

Administrator) will publish annual determinations in the Federal Register no later than 90 days before the effective date of the new E.O. minimum wage rate. The Administrator will also publish the applicable E.O. minimum wage on www.wdol.gov (or any successor Web site) and on all wage determinations issued under the Service Contract Labor Standards statute or the Wage Rate Requirements (Construction) statute. The applicable published E.O. minimum wage is incorporated by reference into this contract.

(3) (i)   The Contractor may request a price adjustment only after the effective date of the new annual E.O. minimum wage determination. Prices will be adjusted only if labor costs increase as a result of an increase in the annual E.O. minimum wage, and for associated labor costs and relevant subcontract costs. Associated labor costs shall include increases or decreases that result from changes in social security and unemployment taxes and workers' compensation insurance, but will not otherwise include any amount for general and administrative costs, overhead, or profit.

(iii) Subcontractors may be entitled to adjustments due to the new minimum wage, pursuant to paragraph (b)(2). Contractors shall consider any subcontractor requests for such price adjustment.

(iv) The Contracting Officer will not adjust the contract price under this clause for any costs other than those identified in paragraph (b)(3)(i) of this clause, and will not provide duplicate price adjustments with any price adjustment under clauses implementing the Service Contract Labor Standards statute or the Wage Rate Requirements (Construction) statute.

(4) The Contractor warrants that the prices in this contract do not include allowance for any contingency to cover increased costs for which adjustment is provided under this clause.

(5) A pay period under this clause may not be longer than semi-monthly, but may be shorter to comply with any applicable law or other requirement under this contract establishing a shorter pay period. Workers shall be paid no later than one pay period following the end of the regular pay period in which such wages were earned or accrued.

(6) The Contractor shall pay, unconditionally to each worker, all wages due free and clear without subsequent rebate or kickback. The Contractor may make deductions that reduce a worker's wages below the E.O. minimum wage rate only if done in accordance with 29 CFR 10.23, Deductions.

(7) The Contractor shall not discharge any part of its minimum wage obligation under this clause by furnishing fringe benefits or, with respect to workers whose wages are governed by the Service Contract Labor Standards statute, the cash equivalent thereof.

(8) Nothing in this clause shall excuse the Contractor from compliance with any applicable Federal or State prevailing wage law or any applicable law or municipal ordinance establishing a minimum wage higher than the E.O. minimum wage. However, wage increases under such other laws or municipal ordinances are not subject to price adjustment under this subpart.

(9) The Contractor shall pay the E.O. minimum wage rate whenever it is

**BLM Agreement No.  L17AC00057**
Recipient Name: Museums of Western Colorado
Project Title: BLM Utah Survey of Paleontological Resources of the Bears Ears National Monument

**Attachment No. 1**
(Pg.  PAGE 10 of 23)

higher than any applicable collective bargaining agreement(s) wage rate.

(10)The Contractor shall follow the policies and procedures in 29 CFR 10.24(b) and 10.28 for treatment of workers engaged in an occupation in which they customarily and regularly receive more than $30 a month in tips.

BLM Agreement No.  L17AC00057

Recipient Name: Museums of Western Colorado
Project Title: BLM Utah Survey of Paleontological Resources of the Bears Ears National Monument

Attachment No. 1
(Pg. PAGE 10 of 23)

(c) (1) This clause applies to workers as defined in paragraph (a). As provided in that definition—

(i)   Workers are covered regardless of the contractual relationship alleged to exist between the contractor or subcontractor and the worker;

(ii)   Workers with disabilities whose wages are calculated pursuant to special certificates issued under 29 U.S.C. 214(c) are covered; and

(iii)  Workers who are registered in a bona fide apprenticeship program or training program registered with the Department of Labor's Employment and Training Administration, Office of Apprenticeship, or with a State Apprenticeship Agency recognized by the Office of Apprenticeship, are covered.

(2) This clause does not apply to—

(i)   Fair Labor Standards Act (FLSA)-covered individuals performing in connection with contracts covered by the E.O., i.e. those individuals who perform duties necessary to the performance of the contract, but who are not directly engaged in performing the specific work called for by the contract, and who spend less than 20 percent of their hours worked in a particular workweek performing in connection with such contracts;

(ii)   Individuals exempted from the minimum wage requirements of the FLSA under 29 U.S.C. 213(a) and 214(a) and (b), unless otherwise covered by the Service Contract Labor Standards statute, or the Wage Rate Requirements (Construction) statute. These individuals include but are not limited to—

(a)  Learners, apprentices, or messengers whose wages are calculated pursuant to special certificates issued under 29 U.S.C. 214(a).

(b)  Students whose wages are calculated pursuant to special certificates issued under 29 U.S.C. 214(b).

(c)  Those employed in a bona fide executive, administrative, or professional capacity (29 U.S.C. 213(a)(1) and 29 CFR part 541).

(d) Notice. The Contractor shall notify all workers performing work on, or in connection with, this contract of the applicable E.O. minimum wage rate under this clause. With respect to workers covered by the Service Contract Labor Standards statute or the Wage Rate Requirements (Construction) statute, the Contractor may meet this requirement by posting, in a prominent and accessible place at the worksite, the applicable wage determination under those statutes. With respect to workers whose wages are governed by the FLSA, the Contractor shall post notice, utilizing the poster provided by the Administrator, which can be obtained at www.dol.gov/whd/govcontracts, in a prominent and accessible place at the worksite. Contractors that customarily post notices to workers electronically may post the notice electronically provided the electronic posting is displayed prominently on any Web site that is maintained by the contractor, whether external or internal, and customarily used for notices to workers about terms and conditions of employment.

(e) Payroll Records.

(1) The Contractor shall make and maintain records, for three years

**BLM Agreement No.  L17AC00057**
Recipient Name: Museums of Western Colorado
Project Title: BLM Utah Survey of Paleontological Resources of the Bears Ears National Monument

**Attachment No. 1**
(Pg.  PAGE 10 of 23)

after completion of the work, containing the following information for each worker:

    (i)   Name, address, and social security number;

BLM Agreement No.  L17AC00057

Recipient Name: Museums of Western Colorado
Project Title: BLM Utah Survey of Paleontological Resources of the Bears Ears National Monument

Attachment No. 1
(Pg.  PAGE 10 of 23)

(ii)  The worker's occupation(s) or classification(s);

(iii) The rate or rates of wages paid;

(iv) The number of daily and weekly hours worked by each worker;

(v)  Any deductions made; and

(vi) Total wages paid.

(2) The Contractor shall make records pursuant to paragraph (e)(1) of this clause available for inspection and transcription by authorized representatives of the Administrator. The Contractor shall also make such records available upon request of the Contracting Officer.

(3) The Contractor shall make a copy of the contract available, as applicable, for inspection or transcription by authorized representatives of the Administrator.

(4) Failure to comply with this paragraph (e) shall be a violation of 29 CFR 10.26 and this contract. Upon direction of the Administrator or upon the Contracting Officer's own action, payment shall be withheld until such time as the noncompliance is corrected.

(5) Nothing in this clause limits or otherwise modifies the Contractor's payroll and recordkeeping obligations, if any, under the Service Contract Labor Standards statute, the Wage Rate Requirements (Construction) statute, the Fair Labor Standards Act, or any other applicable law.

(f)  Access. The Contractor shall permit authorized representatives of the Administrator to conduct investigations, including interviewing workers at the worksite during normal working hours.

(g) Withholding. The Contracting Officer, upon his or her own action or upon written request of the Administrator, will withhold funds or cause funds to be withheld, from the Contractor under this or any other Federal contract with the same Contractor, sufficient to pay workers the full amount of wages required by this clause.

(h) Disputes. Department of Labor has set forth in 29 CFR 10.51, Disputes concerning contractor compliance, the procedures for resolving disputes concerning a contractor's compliance with Department of Labor regulations at 29 CFR part 10. Such disputes shall be resolved in accordance with those procedures and not the Disputes clause of this contract. These disputes include disputes between the Contractor (or any of its subcontractors) and the contracting agency, the Department of Labor, or the workers or their representatives.

(i)  Anti-retaliation. The Contractor shall not discharge or in any other manner discriminate against any worker because such worker has filed any complaint or instituted or caused to be instituted any proceeding under or related to compliance with the E.O. or this clause, or has testified or is about to testify in any such proceeding.

(j)  Subcontractor compliance. The Contractor is responsible for subcontractor compliance with the requirements of this clause and may be held liable for unpaid wages due subcontractor workers.

**BLM Agreement No.  L17AC00057**
Recipient Name: Museums of Western Colorado
Project Title: BLM Utah Survey of Paleontological Resources of the Bears Ears National Monument

**Attachment No. 1**
(Pg.  PAGE 10 of 23)

(k) Subcontracts. The Contractor shall include the substance of this clause, including this paragraph (k) in all subcontracts, regardless of dollar value, that are subject to the Service Contract Labor Standards statute or the Wage Rate Requirements (Construction) statute, and are to be performed in whole or in part in the United States.

**BLM Agreement No.  L17AC00057**
Recipient Name: Museums of Western Colorado
Project Title: BLM Utah Survey of Paleontological Resources of the Bears Ears National Monument

**Attachment No. 1**
(Pg.  PAGE 10 of 23)

*END OF AGREEMENT*

Rev. 06/22/2016

**EXHIBIT D**

# FEDERAL FINANCIAL REPORT

(Follow form instructions)

| 1. Federal Agency and Organizational Element to Which Report is Submitted | 2. Federal Grant or Other Identifying Number Assigned by Federal Agency (To report multiple grants, use FFR Attachment) | Page | of |
|---|---|---|---|
| Department of the Interior, Bureau of Land Management | National Conservation Lands Science Support Grant | 1 | † pages |

**3. Recipient Organization (Name and complete address including Zip code)**
Museums of Western Colorado, 462 Ute. Ave., Grand Junction, CO 81501

| 4a. DUNS Number | 4b. EIN 84-0588068 | 5. Recipient Account Number or Identifying Number (To report multiple grants, use FFR Attachment) L-17AC00057 | 6. Report Type ☒ Quarterly ☐ Semi-Annual ☐ Annual ☐ Final | 7. Basis of Accounting ☒ Cash  ☐ Accrual |
|---|---|---|---|---|

| 8. Project/Grant Period From: (Month, Day, Year) 4/24/2017 | To: (Month, Day, Year) 9/30/2018 | 9. Reporting Period End Date (Month, Day, Year) 9/30/2018 |
|---|---|---|

| 10. Transactions | | Cumulative |
|---|---|---|
| (Use lines a-c for single or multiple grant reporting) | | |
| **Federal Cash (To report multiple grants, also use FFR Attachment):** | | |
| a. Cash Receipts | | $18,444.29 |
| b. Cash Disbursements | | $18,444.29 |
| c. Cash on Hand (line a minus b) | | $0.00 |
| (Use lines d-o for single grant reporting) | | |
| **Federal Expenditures and Unobligated Balance:** | | |
| d. Total Federal funds authorized | | $24,871.00 |
| e. Federal share of expenditures | | $18,761.29 |
| f. Federal share of unliquidated obligations | | $0 |
| g. Total Federal share (sum of lines e and f) | | $18,761.29 |
| h. Unobligated balance of Federal funds (line d minus g) | | $6,109.71 |
| **Recipient Share:** | | |
| i. Total recipient share required | | $0 |
| j. Recipient share of expenditures | | $0 |
| k. Remaining recipient share to be provided (line i minus j) | | $0 |
| **Program Income:** | | |
| l. Total Federal program income earned | | $0 |
| m. Program income expended in accordance with the deduction alternative | | $0 |
| n. Program income expended in accordance with the addition alternative | | $0 |
| o. Unexpended program income (line l minus line m or line n) | | $0 |

| 11. Indirect Expense | a. Type | b. Rate | c. Period From  Period To | d. Base | e. Amount Charged | f. Federal Share |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | g. Totals: | | | |

12. Remarks: Attach any explanations deemed necessary or information required by Federal sponsoring agency in compliance with governing legislation:

13. Certification: By signing this report, I certify to the best of my knowledge and belief that the report is true, complete, and accurate, and the expenditures, disbursements and cash receipts are for the purposes and intent set forth in the award documents. I am aware that any false, fictitious, or fraudulent information may subject me to criminal, civil, or administrative penalties. (U.S. Code, Title 18, Section 1001)

| a. Typed or Printed Name and Title of Authorized Certifying Official | c. Telephone (Area code, number and extension) 970-242-0101 |
|---|---|
| Erik Vlick, Business Manager | d. Email address avlick@westcomuseum.org |
| b. Signature of Authorized Certifying Official | e. Date Report Submitted (Month, Day, Year) 10/3/2018 |
| | 14. Agency use only. |

Standard Form 425 / Revised 6/28/2010
OMB Approval Number: 0348-0061
Expiration Date: 10/31/2011

**Paperwork Burden Statement**
According to the Paperwork Reduction Act, as amended, no persons are required to respond to a collection of information unless it displays a valid OMB Control Number. This valid OMB control number for this information collection is 0348-0061. Public reporting burden for this information collection is estimated to average 1.5 hours per response, including time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding the burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the Office of Management and Budget, Paperwork Reduction Project (0348-0061), Washington, DC 20503.

**EXHIBIT E**

Grand Staircase-Escalante National Monument & Kanab-Escalante Area
Resource Management Plans Scoping | Cultural and Paleontological Resources
Hole-in-the-Rock Historic Trail
Old Spanish Trail
Known Cultural Resource
Paleontological Resource
GSENM Boundary
Planning Area
Kanab Field Office-Escalante Area
Potential Fossil Yield Category
1 Low
2
3 Moderate
4
5 High
OWNERSHIP
BLM
BLM Wilderness Area
USFS Wilderness Area
US Forest Service (USFS)
National Park Service (NPS)
Indian Reservation (IR)
State
Private
Box-Death Hollow Wilderness
Dixie National Forest
Boulder
Escalante
Cannonville
Henrieville
Alton
Glendale
Orderville
Kanab
Fredonia
Big Water
Capitol Reef National Park
Glen Canyon National Recreation Area
Kaiparowits Unit
Paria Canyon - Vermilion Cliffs Wilderness
Lake Powell
UTAH
ARIZONA
Kilometers
Miles
No warranty is made by the BLM for use of the data for purposes not intended by the BLM.

